**LAIDLAW, INC. and Laidlaw Transit, Inc., Plaintiffs,**

v.

**STUDENT TRANSPORTATION OF AMERICA, INC., Denis Gallagher, Robert H. Byrne, John Reddan, John Emberson, John Carey, Peter Pearson, and Thomas Gallagher, Defendants.**

No. CIV. 98–2241(WGB).

United States District Court, D. New Jersey.

Sept. 14, 1998.

Gregory D. Saputelli, Clare M. Diemer, Obermayer, Rebmann, Maxwell & Hippel, LLP, Haddonfield, NJ, Thomas A. Leonard, William J. Leonard, Mathieu J. Shapiro, Edward B. Ertel, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, PA, for Plaintiffs Laidlaw, Inc. and Laidlaw Transit, Inc.

Gerald A. Liloia, Michael R. O'Donnell, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ, Thomas O. Kuhns, Brian D. Sieve, Ellen T. Ahern, James C. Joslin, Kirkland & Ellis, Chicago, IL, for Defendants Student Transportation of America, Inc., Denis Gallagher, Robert H. Byrne, John Reddan, Peter Pearson, and Thomas Gallagher.

## OPINION

BASSLER, District Judge.

Plaintiffs Laidlaw Transit, Inc. ("Laidlaw") and Laidlaw, Inc. have moved for a preliminary injunction against Defendant Student Transportation of America, Inc. ("STA"), a company that competes directly against Laidlaw, and former Laidlaw executives, Defendants Denis Gallagher ("Gallagher") and Thomas Gallagher, who have left Laidlaw to form STA. Plaintiffs also move for supplemental preliminary injunctive relief against Defendants Robert H. Byrne, former Laidlaw legal counsel, and Defendants John Reddan and Peter Pearson, former Laidlaw executives. The Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity). For the reasons set forth below, the Court **denies** Plaintiffs' request for a preliminary injunction and for supplemental preliminary injunctive relief.

## I. *FINDINGS OF FACT*

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact:

### 1. The Parties

#### a. Laidlaw and Laidlaw, Inc.

1. Laidlaw, Inc. is a corporation organized and existing under the laws of the Nation of Canada with its principal place of business in the Province of Ontario. (Ex. D–9, at 1).

2. Laidlaw, Inc.'s 1997 assets were over $6 billion, which was a 24% increase over its fiscal-year 1996 assets. (Tr. at 4:141.)

3. Laidlaw, Inc. had a 1997 revenue of over $3 billion, which was a 32% increase over fiscal-year 1996 revenue. (Tr. at 4:140–41.)

4. Laidlaw is a corporation organized and existing under the laws of the State of Delaware. (Tr. at 1:50.)

5. Laidlaw is a wholly owned subsidiary of Laidlaw, Inc. Laidlaw is in the transit business, specifically including school bus transportation. (Tr. at 1:49.)

6. Laidlaw is the principal consolidator in the school bus industry in North America. (Tr. at 4:141.)

7. Laidlaw's 1997 revenues were $1.36 billion. (Tr. at 4:142.)

8. Laidlaw's market share of school buses operated by the private sector in North America is 25%. (Tr. at 4:142.)

9. In terms of revenues, Laidlaw is three times larger than Ryder—its next largest competitor in the school bus transportation industry. (Tr. at 2:22.)

#### b. STA

10. STA currently operates in three states: California, Oregon and Pennsylvania. In September 1998, STA will begin formal operations in New Jersey. (Tr. at 6:41.)

11. STA's total assets are approximately $10 million. (Tr. at 6:41.)

12. STA's current revenues are approximately $13 million. (Tr. at 6:41.)

13. STA currently owns approximately 450 school buses. (Tr. at 6:41.)

14. STA has approximately 400 employees in the school bus business. (Tr. at 6:41.)

15. Since its formation, STA has purchased four companies: (1) Santa Barbara Transportation in Santa Barbara, California; (2) North Bend Transportation in Oregon; (3) Bortner Bus ("Bortner") in western Pennsylvania; and (4) George Ku & Sons ("Ku") in western Pennsylvania. (Tr. at 6:16–17.)

#### c. The Individual Defendants

##### i. Gallagher

16. Gallagher is a 1976 graduate of Monmouth College with a B.S. in Business Administration. He has over 20 years of experience in the school bus transportation industry. (Tr. at 5:168–72.)

17. Gallagher is currently the Chairman and CEO of Global Passenger Services ("Global"). (Tr. at 5:166.)

18. Global has two subsidiaries—Travelways, Inc., an entertainment transportation company, which is involved with airlines, cruise lines, tour operators, and theme parks, and STA, which provides student transportation services. (Tr. at 6:12–13.)

##### ii. Robert Byrne

19. Byrne attended the University of Windsor, Canada, where he received a degree in economics in 1980. Byrne attended Windsor Law School, where he earned an LLB in 1983. He is licensed to practice law in Ontario, Canada. (Tr. at 6:190–92.)

20. In 1985, Byrne joined a law firm specializing in taxation, where he stayed for approximately one year. In 1986, he joined the Toronto law firm Morris Rose, where he made partner in late 1989. At Morris Rose, he became involved with transportation clients, advising trucking, courier, and bus companies. (Tr. at 6:192–93.)

21. Byrne's current position is Senior Vice President of Global Passenger Services and Senior Vice President, Legal Affairs for both Travelways and STA. (Tr. at 6:190.)

### iii. Peter Pearson

22. Pearson received a B.S. in Marketing from Gannon University in Pennsylvania in 1984. His first job after leaving Gannon was with Federal Express in 1985, where he worked until September of 1991. At the time of his departure from Federal Express, Pearson was a Premium Location Manager. (Tr. at 6:147–49.)

23. Pearson is now employed by STA and Travelways as Vice President of Operations for both companies. (Tr. at 6:147, 156.)

### iv. John Reddan

24. Reddan graduated from St. Joseph's College, New Jersey, in 1972. From 1967–1991, Reddan held various jobs in the human resources and labor relations fields. (Tr. at 7:48–50.)

25. Reddan's current position is Vice President of Human Resources for Global Passenger Services. More than 90% of his time is spent on the Travelways business. (Tr. at 7:47.)

### v. Thomas Gallagher

26. Thomas Gallagher—Denis's father—is 72 years old and is recovering from quadruple bypass surgery. (Tr. at 6:69.)

27. Thomas Gallagher does no substantive work for STA. Before his surgery, Thomas Gallagher came into the office twice a week for a couple of hours and works on tasks such as bus numbering and license and registrations. (Tr. at 6:70–71.)

## 2. The 1987 Sale of the Gallaghers' Business

### a. Gallagher Enterprises, Inc.

28. From 1977–1979, Gallagher worked as a garage mechanic and bus dispatcher in Neptune, New Jersey for Coast Cities, Inc. ("Coast Cities"), a family business started by his grandfather in 1922. From 1978–1979, he was a bus dispatcher in Neptune. In 1979, he joined the management of Coast Cities, and from 1979 until 1984 he served as a Vice President of Coast Cities responsible for day-to-day operations in New Jersey. In 1984, Gallagher became President and CEO of Coast Cities, and acquired a 10% ownership interest in Gallagher Enterprises, Inc. ("Gallagher Enterprises"), the holding company for Coast Cities and its affiliates. (Tr. at 5:168–72.)

29. Gallagher owned Gallagher Enterprises along with his father, Thomas, and his brother, Doug. Denis and Doug each owned 10% of the shares of the company and Thomas owned the remaining 80%. (Tr. at 5:172.)

30. At the time the Gallaghers sold Gallagher Enterprises in 1987, it, through Coast Cities, had seven locations throughout New Jersey, owned approximately 400 school buses and was operating approximately 350, and was serving between 30 and 40 school districts in approximately 14 of the 21 counties in New Jersey. (Tr. at 5:178–80, 6:73; Ex. P–70.)

31. Gallagher Enterprises did no school bus transportation business outside the state of New Jersey. (Tr. at 5:178–79.)

32. Coast Cities was the largest independent school bus contractor in New Jersey at the time Laidlaw acquired it. (Tr. at 6:74; Ex. P–70.)

### b. Negotiations for the Sale of Gallagher Enterprises

33. From 1983 until May 1998, Nick Ferreri served as a consultant to Laidlaw. He worked on between 50 and 100 acquisitions for Laidlaw during this period. (Tr. at 5:141–42.)

34. During the acquisition process, Ferreri would send the vendor with whom he was negotiating: (1) a confidentiality agreement on Laidlaw letterhead that he had signed on behalf of Laidlaw; and (2) a letter from Laidlaw's board of directors confirming that he was authorized to sign the confidentiality agreement on behalf of Laidlaw. Ferreri received the letterhead from Vic Webster, who was president of Laidlaw at the time. (Tr. at 5:144–47.)

35. During the acquisition process, Ferreri was responsible for conducting the initial due diligence for Laidlaw, as well as placing a value on the company to be purchased. (Tr. at 5:148–49.)

36. When Ferreri negotiated acquisitions of school bus companies for Laidlaw, he was Laidlaw's primary negotiator. The Laidlaw attorneys would not become involved until it was time for the parties to sign the letter of intent. (Tr. at 5:145–46.)

37. Ferreri was acting as Laidlaw's authorized agent during the preliminary negotiations for Laidlaw's acquisition of Gallagher Enterprises. (Tr. at 5:151–52.)

### c. The 1987 Sales Agreement

38. On October 9, 1987, Laidlaw acquired Gallagher Enterprises (Tr. at 5:172; Ex. P–1.)

39. Laidlaw, Inc.'s subsidiary, Travelways, Inc., was the company that acquired Gallagher Enterprises. Travelways, Inc. later became Laidlaw. (Tr. at 1:53, 59, 4:52.)

40. Travelways, Inc., then Laidlaw, Inc.'s subsidiary, was incorporated in the State of Delaware and was qualified and authorized to do business in New Jersey. (Ex. P–84.)

41. Pursuant to the 1987 Sales Agreement ("Sales Agreement"), Laidlaw acquired the contracts, customers, goodwill and reputation of Gallagher Enterprises and its Coast Cities subsidiaries. (Tr. at 3:169–70, 6:103–04.)

42. The Sales Agreement provides that Travelways, Inc. would pay $3 million for all of the outstanding shares of Gallagher Enterprises, plus $1 million each to Denis and Thomas Gallagher as compensation for non-competition agreements. (Ex. P–1, Sales Agreement §§ 2.01 & 7.01(d).)

43. The Sales Agreement provided that both Denis and Thomas Gallagher would execute non-competition agreements, in the form of "Schedule F" attached to the Sales Agreement. On October 9, 1987, Gallagher executed Schedule F. The consideration paid to Gallagher for the non-competition agreement was $1 million, payable in two $500,000 payments—the first on January 1, 1988 and the second on or before January 1, 1989. (Ex. P–1, Sales Agreement § 7.01(d); Ex. P–2, Schedule F.)

44. The only consideration paid to Gallagher for this non-competition agreement was the $1 million payment. (Tr. at 3:168.)

45. Paragraph (1) of the Non–Competition Agreements states as follows:

The Covenantor covenants and agrees with Laidlaw that, for a period of five (5) years from the date hereof, or, if the Covenantor shall receive remuneration from Laidlaw or any of its affiliates after the date hereof, for a period of five (5) years from the date hereof or the date on which the Covenantor last receives remuneration from Laidlaw, whichever is later that:

(a) The Covenantor will not within the State of New Jersey, either directly or indirectly, as principal, agent, owner, employee, partner, shareholder, advisor or otherwise howsoever, own, operate or engage in the operation of or have any financial interest in or provide, directly or indirectly, financial assistance to any business operation, whether a proprietorship, partnership, joint venture, private company or otherwise howsoever, carrying on or engaged in any business identical with or similar to the school bus transportation business and related charter services carried on by the Company (the "Business").

(b) The Covenantor shall not directly, or indirectly for himself, itself or for any other person:

(i) solicit passenger transportation business from or perform passenger transportation services for any person, company or other entity which is now a customer of the Company or is hereafter a customer of Laidlaw; or

(ii) induce or attempt to persuade any person now employed by the Company to terminate his employment relationship; or

(iii) advise any person not to do business with the Company or Laidlaw or any of Laidlaw's affiliates.

(c) The Covenantor shall not disclose or use without Laidlaw's prior written consent any secret or confidential information or knowledge relating to the Company, the

Business or Laidlaw or any affiliate thereof. (Exs. P–2 & P–3, ¶ 1.)

46. In the Sales Agreement, the Gallaghers acknowledged that they received valid consideration for their Non–Competition Agreements. (Exs. P–2 and P–3, ¶ 2; *see* Tr. at 6:86.)

47. The Gallaghers further agreed that money damages could not adequately compensate Laidlaw for violations of the agreements and stipulated that Laidlaw would be entitled to injunctive relief in the event either of them violated his Non–Competition Agreement. (Exs. P–2 and P–3, ¶ 3; *see* Tr. at 6:87.)

48. The Sale Agreement also provided for Denis and Thomas Gallagher's employment with Gallagher Enterprises, which was, at that point, a wholly-owned subsidiary of Laidlaw. (Ex. P–1, ¶ 7.01(h); Tr. at 4:52–53.)

49. The Sale Agreement guaranteed Gallagher employment for two years, commencing at closing. (Ex. P–1, ¶ 7.01(h).)

50. The Sale Agreement also provided that Gallagher would be paid $40,000 per year above the salary Laidlaw normally paid for Gallagher's position. (Tr. at 6:129.)

51. The Sale Agreement guaranteed Thomas Gallagher employment for five years, commencing at closing. (Ex. P–1, ¶ 7.01(h).)

52. The parties agreed that the Sales Agreement "shall be governed by the law of New Jersey." (Ex. P–1, Sales Agreement § 10.11.)

53. Laidlaw drafted the Sales Agreement, including Schedule F to that Agreement (Denis and Thomas Gallagher's non-compete agreements). (Tr. at 3:158–59, 5:181.)

54. Shortly after the closing, Laidlaw transferred Gallagher to its payroll. (Tr. at 5:192.)

55. The parties vigorously dispute the time from which the Gallaghers' non-competes began to run. The focus of this dispute is whether remuneration, as stated in the Sales Agreement, means the $1 million consideration for the non-competes, or is broader so that it includes salary.

56. When Laidlaw acquires a company, the principals of the acquired company often become Laidlaw employees. In such cases, Laidlaw contends that it often seeks to obtain a non-competition agreement that extends beyond the period of employment, in order to protect the purchased good will, as well as the goodwill that developed after Laidlaw came in with their capital strength and their own good will. (*See* Tr. at 1:55–56.) Laidlaw argues that the parties' intent, as expressed in the Sales Agreement, was that the non-compete ran from the last date Gallagher drew salary from Laidlaw.

57. In contrast, Gallagher states that no one at Laidlaw ever explicitly told him that the five-year non-competition agreement would run for five years from when he ceased employment with the company. (Tr. at 5:188.)

58. Gallagher states that Ferreri told him that the five-year non-competition agreement would run from the date Laidlaw made its last $500,000 installment on the $1 million for the non-compete. Gallagher states, therefore, that it was his understanding that his five-year period of non-competition began to run when he received that final payment for the non-compete as opposed to any final salary for his employment with Laidlaw. (Tr. at 5:188.)

59. However, when Gallagher negotiated acquisitions on behalf of Laidlaw, on at least one occasion Gallagher stated that it was Laidlaw's position that non-competes in their acquisition agreements started from the time one stopped working for Laidlaw or received any money from Laidlaw whatsoever. He also stated that "remuneration" as used in the acquisition agreements meant any kind of remuneration, be it wages, the non-compete consideration, or money for the sale of the business. (Tr. at 2:85, 112.)

60. Gallagher recalls that he received the two $500,000 payments specified in the Sales Agreement sometime prior to January 1, 1989. Thus, Gallagher received the full $1 million remuneration for the non-compete agreement no later than January 1, 1989. (Tr. at 5:182–83; *See* Ex. P–2, Schedule F.)

### 3. The Individual Defendants' Employment History

#### a. Gallagher

61. Other than the two-year agreement contained within the Sales Agreement, Gallagher did not have a written or oral employment agreement with Laidlaw. After 1989, he was an at-will employee. (Tr. at 3:160–63, 4:112, 5:193.)

62. After the sale of Gallagher Enterprises to Laidlaw, Gallagher continued to work for Gallagher Enterprises as the Director of Operations. In 1988, he went to work for Laidlaw as Regional Vice President responsible for school bus operations in New Jersey, Delaware, and Pennsylvania. In 1992, Laidlaw expanded his responsibilities to include Alabama and Georgia. In June 1994, Laidlaw promoted him to Senior Vice President with responsibility for school bus operations on the East Coast. (Tr. at 5:194–95.)

63. In this position, Gallagher had marketing, sales and operational responsibilities for over 200 locations, 13,000 vehicles and 15,000 employees, which generated revenues in excess of $350 million. (Ex. P–46, Bates No. 100578 ¶ 5.)

64. He reviewed and approved bids made in the East Coast and was responsible for operations, employees, buses, customer contacts, and customer service. (Tr. at 5:196.)

65. Gallagher also served as Laidlaw's chief marketing officer and headed Laidlaw's National Marketing Council. (Tr. at 4:66.) He planned marketing strategy, including conversions. (Ex. P–40, ¶ 4.)

66. A "conversion" is when a provider of school bus transportation services convinces the school district that the district would be better off if the district converts from providing its own school bus transportation services to having a private contractor provide those services. (Tr. at 3:122–23.)

67. Gallagher was also a member of the Executive Committee of the Passenger Services Group. (Tr. at 4:70–71.)

68. In November or December of 1995, Gallagher, along with three others, met with an investment banker in New York City to discuss the possibility of forming a sightseeing business. (Tr. at 5:201–03.)

69. In February 1996, Gallagher decided to resign from Laidlaw. Gallagher tendered his resignation on February 28, 1996 and left on April 1, 1996. (Tr. at 5:205.)

70. In 1987, Gallagher made $100,000 per year. This figure increased to $175,000 at the time he resigned. (Tr. at 4:71–73; Ex. P–1, Sales Agreement, ¶ 7.01(h).)

71. In September or October 1996, Gallagher became the CEO of Liberty Helicopters. (Tr. at 5:208–09.)

72. In December 1996, Gallagher helped form Sightseeing Tours of America, and Liberty Helicopters became one subsidiary of Sightseeing Tours of America. Sightseeing Tours of America subsequently purchased Golden Touch Transportation, an airline crew transportation business. (Tr. at 5:209–10, 6:8.)

73. Between February 1997 and May 1997, Gallagher had discussions with Golder, Thoma, Cressey, Rauner, Inc. ("GTCR"), a private equity firm, about the possibility of forming a new company. (Tr. at 6:9, 11.)

74. In May 1997, Gallagher reached a deal with GTCR to form a new company, Global. Two subsidiaries of Global were also formed at the time of closing: STA and Travelways, Inc. (Tr. at 6:11.)

#### b. Byrne

75. Byrne began working at Laidlaw in June 1992. (Tr. at 6:195–96 .)

76. Byrne did not have a written employment contract with Laidlaw. He was an at-will employee. (Tr. at 1:65–66.)

77. At Laidlaw, Byrne was responsible for a variety of legal and business issues including, among other things, acquisitions, leases, customer agreements, assisting with bids for school bus contracts, demand letters, annual reports, documentation of corporate governance, mergers, windups, amalgamations, trademarks, and operating licenses work. (Ex. P–43, ¶ 20.)

78. During his tenure at Laidlaw, Byrne was responsible for acquisitions of school bus

companies throughout the United States and Canada. (Tr. at 6:200–01; Ex. P–43.)

79. He worked on structuring the acquisitions as well as reviewing leases and any other legal issues that arose in connection with an acquisition. (Tr. at 4:76–77.)

80. Approximately one-half of the acquisitions Byrne worked on were school bus companies. (Tr. at 4:79–81, 6:201; Ex. P–43.) Accordingly to Laidlaw, Byrne was the primary legal support for many of the acquisitions of school bus companies. (*See* Tr. at 2:136.)

81. Byrne had access to Laidlaw's purchase and sale agreements and prospect lists. (Tr. at 4:84–85.)

82. Otherwise, Byrne did not have any operational responsibilities, and he did not have management responsibilities for the operations side of Laidlaw's business, but he was advising those managers. (Tr. at 4:133, 6:203.)

83. Byrne announced his departure from Laidlaw on December 13, 1996 and left approximately one week after that date. (Tr. at 6:212–14.)

84. Byrne initiated the employment discussions with Gallagher. (Tr. at 6:213.)

85. Byrne joined Sightseeing Tours of America at the end of December 1996 as a shareholder and employee. (Tr. at 6:212, 217.)

86. Byrne has been involved in 22 acquisitions for Global. Twenty of those acquisitions involved Travelways—Global's motor-coach subsidiary. When Byrne left Laidlaw, Laidlaw was not involved in the motor-coach business in the United States. (Tr. at 6:216–17.)

87. Byrne has also worked on two STA acquisitions: (1) Santa Barbara Transportation in Santa Barbara, California, and (2) North Bend in Oregon. According to Byrne, Laidlaw did not show interest in acquiring either of those companies while Byrne was at Laidlaw. (Tr. at 6:216–17.)

### c. Pearson

88. Pearson did not have a written employment contract with Laidlaw. He was an at-will employee. (Tr. at 1:65–66.)

89. In September 1991, Pearson started working for Laidlaw. He held the position of District Director of Operations ("DDO") for South and Central New Jersey from September 1991 to May or June 1992. (Tr. at 6:148–49.)

90. In May or June 1992, Pearson became a Division Manager in Pittsburgh for Laidlaw, with responsibility for seven or eight Laidlaw facilities or terminals and approximately 600 vehicles. He held this position until December 1996. The school bus transportation contracts that Pearson had responsibility for during this period were primarily in Westmoreland County, Pennsylvania. During this period, Pearson was responsible for three other counties in Pennsylvania, Fayette, Greene, and Allegheny Counties. In these latter three counties, however, Laidlaw had a total of only four contracts. (Tr. at 3:82–83, 6:149–52.)

91. Pearson was not responsible for the entire western portion of Pennsylvania. In fact, Laidlaw employed three additional division managers other than Pearson in western Pennsylvania at that time. (Tr. at 6:150, 152.)

92. In this position, he had extensive customer contact and assisted in contract negotiations. (Tr. at 3:82–83.)

93. On January 1, 1996, Pearson was promoted to DDO in the Southeast, which included North Carolina, South Carolina, Florida, and Georgia. In January 1997, Pearson became Director of Business Development for Laidlaw for Florida, a position he held until he resigned from Laidlaw in September 1997. (Tr. at 1:95, 2:130, 6:153–54.)

94. In this last position, Pearson and his direct supervisor were responsible for developing business for Laidlaw through conversions of school districts from using public transportation to private contractors. (Tr. at 2:130.)

95. Pearson initiated employment discussions with Gallagher. Pearson joined STA

and Travelways on or about September 22, 1997. (Tr. at 6:155–56.)

### d. John Reddan

96. In August 1991, Reddan joined Laidlaw as the Director of Human Resources for the Mid–Atlantic region. His responsibilities later expanded to include the entire east coast. At Laidlaw, Reddan had responsibility for labor contract negotiations and limited responsibility for recruiting. (Tr. at 7:50–52, 55–56.)

97. Reddan did not have a written employment contract with Laidlaw. He was an at-will employee. (Tr. at 1:65–66, 7:59.)

98. At Laidlaw, Reddan had no responsibilities for preparing bids for school bus transportation contracts, nor did he have any customer contacts. He never received or reviewed Laidlaw's maintenance, conversion, or driver training manuals. He did not help prepare any business or strategic plans. Reddan never received copies of those plans. (Tr. at 7:56, 70–71.)

99. Reddan had access to all of Laidlaw's labor agreements and costs, which are not public, as well as confidential salary and bonus information for all of the management staff and performance reviews for each of those people. He knows Laidlaw's succession planning—who is promotable and Laidlaw's plan for developing those individuals. (Tr. at 4:83–84.)

100. Reddan does not know Laidlaw's current labor costs. (Tr. at 7:72–73.)

101. Reddan left Laidlaw on January 24, 1997 due at least in part to health reasons. (Tr. at 7:64–69.)

102. While still at Laidlaw, Reddan initiated contact with Gallagher to see if Gallagher had any employment opportunities for him. Gallagher informed him that there was a position in human resources available at Sightseeing Tours of America. Reddan joined Sightseeing Tours of America at the end of January 1997 as the Vice President of Human Resources. (Tr. at 7:68–70.)

103. Reddan has never had operational responsibilities in any of the various positions he has held in the human resources field. (Tr. at 7:47, 50.)

### e. Thomas Gallagher

104. Thomas Gallagher retired from Laidlaw in late 1997. (Tr. at 1:89–90.)

105. When Thomas Gallagher left Laidlaw, he did not have a written employment contract. He was an at-will employee.

106. As previously stated, Thomas Gallagher does no substantive work for STA. Before his heart surgery, Thomas Gallagher came into the office twice a week for a couple of hours to work on administrative tasks. (Tr. at 6:70–71.)

### 4. Laidlaw's Stock–Option Non–Compete Agreements

#### a. History

107. Laidlaw offered a Stock–Option Plan to senior officers of the company. In exchange for the stock options, participants were required to sign a non-competition agreement. (Tr. at 1:91–92; Ex. P–10.)

108. Laidlaw had two versions of the Stock–Option Non–Competition Agreement. The initial version was in effect under the 1984 Stock–Option Plan. The Plan and the Non–Competition Agreement were revised in 1991. (Tr. at 4:24–25.)

109. The 1984 Stock–Option Non–Competition Agreement covered a broader geographic area than the 1991 Stock–Option Non–Competition Agreement. The 1984 form provided that the covenantor would not be involved in a competing business in any one of nine geographic areas, the broadest of which, included: "the geographical areas within which Laidlaw carries on the Business;" and "any municipality in which Laidlaw does business, and 200 miles therefrom ." (Ex. D–16, ¶ 3(a).)

110. The 1984 non-compete prohibited the covenantor from competing "in any aspect of the business of transporting people by motor vehicle." (Ex. D–16, ¶ 3.)

111. The non-compete period in the 1984 form was five years. (Ex. D–16, ¶ 3.)

112. In 1989, Gallagher entered the Stock–Option Plan and signed this 1984 version of the stock-option non-compete. (Ex. D–16.)

113. Laidlaw is not seeking injunctive relief pursuant to Gallagher's 1989 stock-option non-compete agreement. (Tr. at 4:28–29.)

114. In an August 14, 1987 letter, Jeffrey K. Wohlstadter of the Chicago law firm Katten, Muchin & Zavis, rendered an opinion regarding Laidlaw's 1984 version of the stock-option non-competition agreement ("Katten Muchin Letter"). (Tr. at 5:102, 105; Ex. D–6.)

115. In the Katten Muchin Letter, Wohlstadter opined:

We believe that Laidlaw's standard waste and standard transit non-competition agreements would be extremely difficult to enforce anywhere in the United States, particularly because of the five year term and geographic scope of those agreements. (Ex. D–6.)

116. The Katten Muchin Letter also advised Laidlaw that all non-competition periods in excess of one year risked being unenforceable, particularly with respect to lower level executives. (Ex. D–6.)

117. The Katten Muchin Letter urged Laidlaw to employ different non-compete provisions depending on the level or position of the executive. (Ex. D–6.)

118. Finally, the Katten Muchin Letter advised Laidlaw to limit the geographic scope of the restraints to be imposed upon employees based on each individual's exposure to specific confidential materials. (Ex. D–6.)

119. In the spring of 1989, Gallagher received the Katten Muchin Letter in inter-office mail from Howard Wallack, who was his supervisor at the time.

120. Gallagher also participated in a Laidlaw management meeting in early 1989 during which management discussed the enforceability of Laidlaw's standard stock-option non-competition agreements. (Tr. at 5:102–04.)

121. Gallagher kept a copy of the Katten Muchin Letter in his personal file. (Tr. at 5:106–07.)

122. Although the letter was dated August 14, 1987, Laidlaw did not revise its standard stock-option non-compete agreement until 1991. (Tr. at 4:44.)

123. The revised agreement did incorporate some changes. The 1991 form provides that the covenantor will not be involved in a competing business "in the geographic area in which the Covenantor was actively involved in the management and operation" of Laidlaw. (Ex. P–9, ¶ 3(a).)

124. Also, the five-year period in the 1984 version was reduced to three years in 1991 form. (Ex. P–9, ¶ 3.) However, the Katten Muchin Letter clearly indicated that time periods in excess of one year were risky, particularly for lower level executives. (Tr. at 4:44–45; Ex. D–6; Ex. D–9, Byrne Stock–Option Agreement.)

125. Additionally, although Laidlaw was advised in 1987 to vary the terms of its restrictive covenants depending on the level of the executive, Laidlaw chose to not vary the terms of the prohibitions in its stock-option non-competes. (Tr. at 4:44–46; Ex. D–6.)

126. Laidlaw was also advised to vary the restraints in the stock-option non-competes depending on the type of confidential information to which the executive was privy, but Laidlaw chose not to take this advice as well. (Tr. at 4:46–47; Ex. D–6.)

127. Bernard Vardzel, Laidlaw's Regional Director of Maintenance, signed the same restrictive covenant as did Byrne in the Laidlaw legal department, Reddan in Human Resources, or anyone else who participated in Laidlaw's stock-option plan after 1991. (Tr. at 4:46–47).

b. **Byrne, Pearson, and Reddan Enter the Stock–Option Plan**

128. In May 1993, Byrne received a letter stating that he had been approved for Laidlaw's stock-option program. About a month later, he received the stock-option non-compete. In June 1993, Byrne signed this non-compete agreement (which was dated May 1, 1993) and became a participant in Laidlaw's

Stock–Option Plan. (Tr. at 1:90–91, 6:205–08; Ex. P–9.)

129. Byrne did not seek independent legal advice prior to signing the Laidlaw stock-option non-compete agreement. (Tr. at 6:207–08.) However, there is no evidence to suggest that Laidlaw pressured Byrne to sign it immediately or without seeking independent legal advice. Furthermore, Byrne himself is an attorney.

130. Byrne received and exercised some options. (Tr. at 1:92, 94.)

131. Pearson enrolled in Laidlaw's stock-option plan on May 1, 1992, and signed the stock-option non-compete at that time. (Tr. at 6:167–68; Ex. P–18, Pearson Stock–Option Agreement.)

132. Pearson did not seek independent legal advice prior to signing the Laidlaw stock-option non-compete agreement. He did not discuss the terms of the non-competition agreement with anyone at Laidlaw before he signed it. (Tr. at 6:183–84.) However, there is no evidence to suggest that Laidlaw pressured Pearson to sign it immediately or without seeking independent legal advice.

133. Although he received options in 1997, he never exercised those options. (Tr. at 1:96; 6:168–69.)

134. On May 1, 1992, Reddan signed Laidlaw's stock-option non-compete agreement. (Tr. at 7:56–57; Ex. P–21.)

135. Reddan did not seek independent legal advice before signing the Laidlaw stock-option non-compete agreement. (Tr. at 7:57.) However, there is no evidence to suggest that Laidlaw pressured Reddan to sign it immediately or without seeking independent legal advice.

136. Reddan received options under the Stock–Option Plan; however, Reddan has never exercised any of the options he received. (Tr. at 1:96, 7:59.)

c. **Terms And Conditions of the Stock–Option Non–Competes**

137. Paragraph 3 of the Stock–Option Non–Competition Agreements signed by Byrne, Pearson, and Reddan provides as follows:

The Covenantor covenants and agrees with Laidlaw that for a period of three (3) years from the date on which the Covenantor ceases for any reason whatsoever to receive remuneration from Laidlaw that:

(a) the Covenantor will not, either directly or indirectly, as principal, agent, owner, employee, partner, shareholder, advisor or otherwise howsoever own, operate or engage in the operation of or have any financial interest in or provide, directly or indirectly, financial assistance to any business operation, whether a proprietorship, partnership, joint venture, private company or otherwise howsoever, carrying on or engaged in any business identical with or similar to the business carried on by Laidlaw at any time during the period of employment of the Covenantor by Laidlaw, with respect to which and in the geographic area in which the Covenantor was actively involved in the management and operation (the "Business").

(b) The Covenantor shall not directly, or indirectly, for himself or for any other person:

(i) solicit business of the type described in clause 3(a) from or perform services in such business for any person, company or other entity which is now or hereafter a customer of Laidlaw;

(ii) induce or attempt to persuade any person now or hereafter employed by Laidlaw to terminate his employment relationship; or,

(iii)advise any person not to do business with Laidlaw.

(c) The Covenantor shall not disclose or use without Laidlaw's prior written consent any secret or confidential information or knowledge relating to the Business of Laidlaw.

(Exhibits P–9, P–18 and P–21, ¶ 3.) Thus, pursuant to ¶ 3(a), Plaintiffs seek to prohibit Byrne from competing in the United States, Pearson from competing in the Southeastern United States and Western Pennsylvania, and Reddan from competing on the East Coast of the United States. (Memorandum of Law in Support of Plaintiffs' Motion for

Supplemental Preliminary Injunctive Relief ("Supp.P.I. Mov.Br.") at 14.)

138. The Stock–Option Non–Competition Agreements state that Byrne, Pearson, and Reddan were "actively involved in the management and operation of the business of Laidlaw" and obtained "confidential information concerning the business and customer base of Laidlaw." (Exs. P–9, P–18 & P–21, at 1.)

139. In the non-competition agreements, Byrne, Pearson, and Reddan acknowledged that they attended management and policy meetings, that they participated in the management of Laidlaw's business, and that they have secret and confidential information relating to Laidlaw's business. (Exs. P–9, P–18 & P–21, ¶ 2.)

140. Byrne, Pearson, and Reddan further agreed that if they violated their Agreements Laidlaw would be entitled to injunctive relief because money damages could not adequately compensate Laidlaw. (Exs. P–9, P–18 & P–21, ¶ 9.)

141. The only consideration recited in the Agreements for Laidlaw employees who signed the stock-option non-compete was a $10 payment and the opportunity to participate in the stock-option plan. (Tr. at 4:19–20; Ex. P–9, at 1.)

142. None of the individual defendants actually received the $10 consideration. (Tr. at 4:19–20.)

143. Laidlaw's stock-option non-compete agreement is a standard document drafted by Laidlaw. While the terms of the agreement are non-negotiable, an employee may choose not to participate in Laidlaw's stock-option plan, and thus, can avoid signing the non-compete agreement. (Tr. at 2:67–68.)

144. If an employee refused to sign the stock-option non-compete, he was not fired, demoted, or in any way restricted from any confidential information. (Tr. at 3:182–83.)

145. In fact, Larry Jamison, who is currently Laidlaw's District Manager for Northwestern New Jersey, who is in charge of 6 Laidlaw terminals, and who is very familiar with Laidlaw's operations, its bidding, and the costs for the components of bids in New Jersey, decided not to, and does not, participate in Laidlaw's stock-option plan. (See Tr. at 2:83, 112, 115–16.)

### d. STA's Stock–Option Non–Competition Agreements

146. Gallagher's new companies, STA and Travelways, also have a stock-option plan. Pearson and other employees of STA and Travelways have signed non-competition agreements in connection with participation in the stock-option plan. (Tr. at 7:33; Ex. P–81.)

147. The period of non-competition under those agreements is two years, beginning on the "Effective Date," which is defined as "the date that the Covenantor last receives remuneration of any kind from [Travelways or STA]." (Ex. P–81, ¶ 1.1(a), (d).)

148. Gallagher signed the agreements on behalf of STA and Travelways. (Ex. P–81, at 6.)

149. Byrne supervised the outside counsel who drafted the agreements and instructed them with regard to the terms of those agreements. (Tr. at 7:33.)

150. The geographic scope of the STA non-competition agreements extends to "the territorial areas over which Covenantor had, at any time during his employment, either managerial responsibilities for the Corporations' operations or business development responsibilities for the Corporations." (Ex. P–81, ¶¶ 1.1(e), 2 .1.)

151. The STA non-competition agreements include, among other things, covenants not to engage, in any way, in activities that are competitive with STA; not to solicit customers of STA; not to solicit employees of STA; and not to disclose or use STA's confidential information. (Ex. P–81, ¶ 2.1.)

### 5. Confidential or Proprietary Laidlaw Materials.

152. No Defendant removed any confidential or proprietary documents or materials from Laidlaw when he left Laidlaw. (Tr. at 6:49–50, 166–67, 169–70, 214, 7:90.)

153. Laidlaw admits that it has no evidence that any of the Defendants took any

confidential or proprietary documents or materials with them when they left Laidlaw. (Tr. at 1:113–14.)

154. Defendants have done things that are inconsistent with their current position that there is no confidential information in the school bus business.

155. In Laidlaw's Stock–Option non-competition agreements signed by Byrne, Reddan and Pearson, they acknowledge that they obtained confidential information while employed by Laidlaw. (Exs. P–9, P–18, and P–21, ¶ 2.)

156. Gallagher and Byrne have each signed a Senior Management Agreement with Global, STA and Travelways. (Exs. P–71 & P–72; Tr. at 6:97–98.)

157. In the Senior Management Agreements, Gallagher and Byrne acknowledged and agreed that, as employees of STA, in the school bus business, they would obtain confidential information, including but not limited to, technology, methods of doing business, supplier and customer information, and information concerning acquisitions. (Exs. P–71 & P–72, ¶ 9(a).)

158. They further agreed that this confidential information was the property of STA and that STA's continued success "depends in large part on keeping this Confidential Information from becoming known to competitors ...." (Exs. P–71 & P–72, ¶ 9(a).)

159. Gallagher and Byrne each agreed that they would not, at any time, during or after his employment with STA, disclose or use for their own account any of this Confidential Information. (Exs. P–71 & P–72, ¶ 9(a).)

160. Gallagher's and Byrne's Senior Management Agreements with STA also include non-competition and non-solicitation provisions. (Exs. P–71 & P–72, ¶ 10.)

161. In the non-competition provision, Gallagher and Byrne acknowledged that, in the course of their employment with STA, they will become familiar with trade secrets and other confidential information. (Exs. P–71 & P–72, ¶ 10(a).)

162. Gallagher acknowledged that confidential information is used in preparing bids for school bus services even in states like New Jersey that have a competitive public bidding process. (Tr. at 6:23.)

163. In response to discovery requests directed to Gallagher, STA, and Byrne, each stated that STA's "current bids, business plans, and related documents ... constitute highly proprietary, confidential business information." (Exs. P–49, P–53, & P–54, Response Nos. 6 and 20.)

164. Pearson acknowledged that elements of bid preparation, like a company's internal rate of return, are confidential. (Tr. at 6:165 .)

### a. Laidlaw's Bid Worksheet

165. The only document that Laidlaw contends Defendants took when they left Laidlaw is a "fill-in-the-blank" bid worksheet that is given to school districts without any confidentiality restrictions. (Tr. at 2:56–57; Ex. D–3.)

### b. Laidlaw's Maintenance Manual

166. Laidlaw shares at least portions of the Laidlaw Maintenance Manual with prospective customers. (Tr. at 7:113.)

167. Vardzel, Laidlaw's Regional Director of Maintenance, does not contend that any of Defendants took Laidlaw's Maintenance Manual with them when they left Laidlaw. (Tr. at 2:165.)

168. Gallagher has never read Laidlaw's maintenance policy, nor does he have any knowledge that any former Laidlaw employee whom Global hired took Laidlaw's maintenance policy when that employee left Laidlaw. (Tr. at 6:57–59.)

169. Although Pearson reviewed the Manual while at Laidlaw, he did not take a copy of Laidlaw's maintenance manual with him when he left Laidlaw. He has never seen a copy of that manual at STA. (Tr. at 6:169–70.)

170. Reddan never received a copy of Laidlaw's maintenance manual. (Tr. at 7:70.)

171. STA has not hired any former Laidlaw employees who worked in maintenance at Laidlaw. (Tr. at 6:59.)

172. STA does not have a maintenance manual. Instead, STA uses a policy that was already in place at Santa Barbara Transportation before STA purchased that company. Moreover, all maintenance information can be obtained from the school bus manufacturer. (Tr. at 6:57–58.)

#### c. Laidlaw's Drivers' Training Manual

173. Nothing about the contents of a drivers' training manual is confidential or proprietary. STA receives its driver training information from its insurance company, Travelers Insurance, as well as from a coach company that Travelways purchased in Pennsylvania—Palmeri Motor Coach. (Tr. at 6:60–61.)

174. Gallagher never read Laidlaw's Behind the Wheel Driver Training manual. He did not take that manual with him when he left Laidlaw. Nor does he have any knowledge that any former Laidlaw employees now employed by STA took a copy with them when they left Laidlaw. (Tr. at 6:60; *see* Ex. P–33.)

175. Although Pearson reviewed the "Behind the Wheel" manual while at Laidlaw, he did not take a copy of it with him when he left Laidlaw and he has not seen a copy of that manual at STA. (Tr. at 6:170.)

176. Reddan never received a copy of Laidlaw's drivers' training manual. (Tr. at 7:70.)

#### d. Laidlaw's Conversion Manual

177. After a district decides to "convert" in New Jersey, the district must follow the statutory contract-bidding framework in New Jersey, and award the contract to the lowest responsible bidder. (Tr. at 3:123.)

178. During his work at Coast Cities and Gallagher Enterprises, Gallagher was involved in several conversions. (Tr. at 5:173.)

179. There is nothing confidential about the conversion process because it simply entails being a good salesman—being able to convince the school district that it will be better off if it puts its school bus contract up for bid. STA does not have its own conversion program. (Tr. at 6:62–63.) Most of the contents of Laidlaw's Contract Retention and Conversion Manual ("Conversion Manual") are basic, common sense salesmanship.

180. Gallagher never read Laidlaw's Conversion Manual while he was at Laidlaw. Gallagher did not take that Manual with him when he left Laidlaw; nor does he have any knowledge that any former Laidlaw employees now employed by STA took a copy with them when they left Laidlaw. (Tr. at 6:61–62.)

181. Pearson never read Laidlaw's Conversion Manual either. He did not take a copy of the Conversion Manual with him when he left Laidlaw, and he has never seen a copy of that Manual at STA. (Tr. at 6:166–67.)

182. Reddan never received a copy of Laidlaw's Conversion Manual. (Tr. at 7:70.)

#### e. Laidlaw's Business and Strategic Plans

183. Gallagher left Laidlaw on April 1, 1996, before Laidlaw had begun work on the 1997 business plan. (Tr. at 6:51.)

184. Laidlaw's business plans are revised each year. (Tr. at 4:136.)

185. Laidlaw's strategic plans (as opposed to its business plans) are rolling two–to five-year plans that are refreshed every year. (Tr. at 4:137.)

186. Any information that Gallagher personally learned at Laidlaw regarding Laidlaw's business or strategic plans is at least two years old. (Tr. at 2:50–51.)

187. John Reddan does not have any knowledge of Laidlaw's current business plan. Reddan did not prepare strategic or business plans while at Laidlaw, nor did he receive copies of such plans. (Tr. at 7:71.)

#### f. Laidlaw's Legal Files

188. Robert Byrne took no Laidlaw legal files with him when he left Laidlaw. He has not seen any Laidlaw files at STA. (Tr. at 6:214.)

189. Since leaving Laidlaw, Byrne has not used or disclosed any of the confidential legal information he obtained at Laidlaw, nor

does he consider any of this information useful to him at STA. (Tr. at 6:220–21.)

#### g. Laidlaw's Route Tying Information

190. The primary software used by Laidlaw to tie routes together in the school bus transportation industry is Edulog. Edulog is a commercially available software program. (Tr. at 2:52.)

191. Laidlaw had no written policy for how to "route tie." (Tr. at 6:64–65.)

192. To effectively tie routes together, a school bus transportation provider only needs to know what time the buses have to be where—information that the school districts provide. Anyone can simply look through the bid specifications, determine route times, and work out route tying on his own based on what time the buses operate. (Tr. at 6:64–65.)

193. Gallagher's experience at Laidlaw pertaining to route tying is not beneficial to him today at STA because route tying is relatively simple and straight forward in New Jersey. (Tr. at 6:64–65.)

194. Additionally, routes in New Jersey are set by the school district and can change every year. (Tr. at 2:143–44.)

195. Because routes change every year, computerized routing is not overly advantageous in New Jersey. (Tr. at 2:144; *see* Tr. at 2:52.)

#### h. Laidlaw's Hurdle Rates and Margins

196. Hurdle rates are expected levels of profitability or internal rates of return that a company wishes to achieve in order to maintain a level of profitability. (Tr. at 1:70.)

197. Hurdle rates vary with respect to different geographic locations, and they change over time. In part, this is due to the presence of competition at a given place and time. However, absent a dramatic change, there is a general historic trend in each district that does not vary greatly. (Tr. at 1:70–73.)

198. Gallagher does not know Laidlaw's current internal return rates or its hurdle rates. The most recent information he had

on Laidlaw's hurdle rates and rates of return is from 1996. (Tr. at 6:52.)

199. John Reddan does not know Laidlaw's current internal rates of return, and he never had access to that information while he was employed by Laidlaw. (Tr. at 7:71–72.)

#### i. Other Cost Components of a Bid

200. Labor, equipment, insurance, and most other costs that go into a bid for a school bus contract vary from district to district and from year to year. (Tr. at 2:40–50.)

#### 6. Solicitation of Laidlaw Employees by Defendants

201. Gallagher and the other individual defendants did not initiate any employment conversations with any Laidlaw employee. To the extent any of the defendants had conversations with Laidlaw employees regarding employment at STA, Travelways or Global, it was the Laidlaw employee who first brought up the subject matter. (Tr. at 6:43–44, 169, 233, 7:82–83.)

202. STA retained DHR International, Inc. ("DHR"), a professional search firm, to assist it in filling certain job positions. Neither Gallagher nor anyone else at STA asked DHR to target or solicit Laidlaw employees. Indeed, it was Denis Gallagher's desire that DHR "stay out of Laidlaw." (Tr. at 6:43–44; Ex. D–78, Affidavit of Robert E. Reilly, Jr. ("Reilly Aff.") (President DHR), ¶¶ 2–3.)

203. During DHR's efforts to locate prospective candidates to fill the positions for STA, five or six Laidlaw employees and/or former Laidlaw employees did surface. However, any contact by DHR with Laidlaw employees was inadvertent and contrary to Gallagher's instructions. (Reilly Affidavit, ¶¶ 3, 5.)

204. Reddan also had contact with DHR regarding Global's efforts to hire a CFO for Travelways. Reddan specifically told the DHR employee with whom he had been in contact to stay away from Laidlaw employees. (Tr. at 7:83.)

205. Reddan never solicited Ray Burke to work for STA, Travelways, or Global. (Tr. at 7:89.)

206. Reddan did call Ray Burke, who was Laidlaw's maintenance manager in the Memphis area, to see if Burke knew how Reddan could contact Charlie Martin, who had been with Laidlaw in Orlando but had since left the company. During that conversation, Burke asked Reddan if Global had any employment opportunities for him. Reddan responded that there were none at that time. (Tr. at 7:86–89.)

207. Gallagher never solicited Robert Hach for employment at Global, Travelways or STA, although they did talk from time to time about how Gallagher and his new businesses were doing. (Tr. at 6:44.)

208. In mid–1997, Hach had two discussions on his own with GTCR about joining Global. After reviewing GTCR's investment memorandum, the term sheet, and discussing the matter with his wife, Hach ultimately decided to stay at Laidlaw. (Tr. at 6:45–48.)

209. Out of the approximately 2,000 individuals employed by Global and all of its subsidiaries, only about 20 of those individuals are former Laidlaw employees. (Tr. at 6:48–49.)

210. Byrne, who took detailed notes regarding the circumstances surrounding the hiring of the former Laidlaw employees who joined Global and its subsidiaries, is not aware of any former Laidlaw employee whom STA or Travelways solicited or recruited to leave Laidlaw. (Tr. at 6:221–33.)

### 7. Interference With Laidlaw's Customer Relationships

211. The New Kensington Arnold School District is a Laidlaw customer as a result of a contract negotiated two years ago that was scheduled to run until 2001. (Tr. at 3:85.)

212. Pearson personally negotiated that contract for Laidlaw. (Tr. at 3:85, 6:178–80.)

213. After Pearson went to STA, he solicited business from the president of the New Kensington Arnold School District, at a convention, and convinced him to exercise a "90–day" provision in the Laidlaw contract that allowed the district to seek proposals for a new contract. (Tr. at 3:85–86.)

214. Pearson also invited the solicitor, the superintendent, the school board secretary, and school board members to dinner to tell them about STA. (Tr. at 6:178.)

215. At some point after that dinner, the school board issued a request for proposals. (Tr. at 6:178–79.)

216. STA competed with Laidlaw for the new New Kensington Arnold contract. (Tr. at 6:158, 160.)

217. Pearson also worked on Laidlaw's proposal to Martin County, Florida when he was employed by Laidlaw. As a Laidlaw employee, he developed relationships with the administrators, board members and local taxpayer groups influential in the decision to privatize. (Tr. at 3:114.)

218. Pearson met with the head of the taxpayer group and lobbied him on behalf of Laidlaw. (Tr. at 3:115.)

219. Then, he left Laidlaw and, shortly thereafter, met again with that gentleman, but this time on behalf of STA. (Tr. at 3:115.)

220. After joining STA, Pearson submitted a competing proposal to Martin County. (Tr. at 2:151, 6:177–78.)

221. Former Laidlaw employees now working for STA developed personal relationships with Laidlaw's customers in New Jersey. In at least some instances, these people have used those relationships against Laidlaw, actually going to Laidlaw's customers and soliciting business for STA by persuading the customers to put their existing contracts out to bid rather than renewing those contracts with Laidlaw. (Tr. at 2:87–88.)

### 8. The School Bus Transportation Market In New Jersey

#### a. The New Jersey Public Bidding Process

222. School bus transportation contracts in New Jersey are generally one-year contracts, subject to renewal. (Tr. at 6:31.)

223. In New Jersey, there are many small school districts. (Tr. at 6:64.)

224. Every school district bids their own routes. (Tr. at 6:64.)

225. Cyrena Cozzi has worked as the Transportation Coordinator of the Lower Camden Regional School District for 17 years. She has responsibilities for school bus contracting and bid specifications. Cozzi has been involved in the school bus bidding process for bus routes 14 times over her 17 years. (Tr. at 1:132–33, 137.)

226. Bidding and contracting for public school bus transportation in New Jersey are regulated by statute. N.J.S.A. § 18A:18A–15, 37.

227. Pursuant to statute, each school board must make specifications and plans for school bus transportation contracts publicly available. Each school board is required to publish in various newspapers of record the fact that such a contract is open for bidding. The school board must provide information about where bid specifications can be obtained by any interested prospective bidder. All such advertisements must run for at least 10 days prior to the date fixed for receiving bids. (Tr. at 1:140–41; Ex. D–73, Affidavit of Theresa Coia ("Coia Aff.") ¶ 3.) *See also* N.J.S .A. § 18A:18A–21.

228. Bid specifications are provided to anyone who contacts a school board to request them. Bidding is completely open to the public and is not in any way limited to those companies who may have bid in the past or who received invitations to bid. (Tr. at 1:141–42; Coia Aff. ¶ 3.)

229. Sealed school bus transportation contract bids are submitted to each regional school board. At a fixed time and place, all bids received by the school board are unsealed and announced. (Tr. at 1:142; Coia Aff. ¶ 4.) *See also* N.J.S.A. § 18A:18A–21.

230. In advance of bidding, any prospective bidder can obtain information regarding that school district's prior or existing school bus contracts. Prospective bidders may also obtain information on bids that were submitted to the school board in the past in connection with existing or prior contracts. Competing companies can, and often do, obtain all prior information and prices that competitors have submitted in previous bidding contests for any school district. (Tr. at 1:143–47, 2:33–34; Coia Aff. ¶ 5.)

231. In New Jersey, every piece of paper that Laidlaw or any other competitor submits in connection with its bid is available to the members of the public once those bids are opened. (Tr. at 2:33–34.)

232. Numerous variable cost components enter into every bid. These components differ from bid to bid and from district to district and from year to year. (Tr. at 2:40–50.)

233. In addition, the school districts themselves change over time, and this would impact on the requirements that districts include in the school bus contract specifications. (Tr. at 1:138.)

234. By statute, New Jersey school districts must award school bus transportation contracts to "the lowest responsible bidder." In Lower Camden Regional School District, this requirement has meant in practice that they take the lowest bidder. (Tr. at 1:147–49.)

235. In application, "responsible" means capable of performing the contractual duties. When school bus transportation contracts are signed, the contractor provides a performance bond or a surety bond to ensure that the contractor will fulfill the contract, or pay for the school district to find someone else to do it. (Tr. at 1:147, 164–65.)

236. School districts generally do not consider customer goodwill, personal relationships, confidential data, or prior customer relationships in determining whether a bidder is responsible. (Tr. at 1:148–49.)

237. Cost or price is the predominant factor school districts consider in awarding school bus transportation contracts in New Jersey once the decision has been made to open the contract for bidding. (Tr. at 1:149, 164.)

238. Jamison, who has participated in approximately 1,000 bids in New Jersey, could not name a single instance where the lowest bidder who met all of the contract specifications set by the district did not receive the contract. The lowest responsible bidder requirement is enforced only in cases of extremely bad service by a previous provider. (Tr. at 2:108–09.)

239. Pursuant to statute, a school district may renew a school bus transportation contract with its current contractor as long as the renewal price does not exceed 30% of the original contracting price. Other than the renewal process and the public bidding process, there is no other way a contract can be awarded in New Jersey. (Tr. at 1:150–51.)

240. Thus, in New Jersey, contracts for school bus services are not required to be bid each year. Although they are generally one year contracts, as long as the price does not increase more than 30% above the original price, a school district may choose to renew the contract indefinitely without engaging in the public bidding process. (Tr. at 1:150–51, 2:86, 6:80; Ex. P–70.)

241. When Laidlaw purchases a bus company, it purchases not only that company's contracts, but also the right to renew those contracts. (Tr. at 2:86.)

242. While goodwill, customer relationships, and corporate reputation are unimportant once a contract goes to the bidding process, they are important in obtaining renewals of contracts in New Jersey. (Tr. at 2:87, 89.)

**b. The State of Competition in New Jersey**

243. On December 16, 1997, the State of New Jersey Commission of Investigation ("Commission of Investigation") issued a report containing factual findings and recommendations stemming from its investigation into the New Jersey school transportation industry. This report sets forth findings of fact on critical issues currently facing the New Jersey school bus transportation industry, including the following:

(1) Conditions which foster and permit collusive bidding and related abuses are prevalent throughout New Jersey's school transportation system. . . . [;]

(2) Trends in pupil transportation in New Jersey reflect the appearance and growing dominance of large, multi-state bus companies that are both under-bidding and buying out smaller competitors. . . . [; and]

(3) Many school district transportation programs involve vendors selected through an extremely narrow bidding process.

In fact, one New Jersey school district reported having a single bidder for the last 35 years. (Ex. D–2, at 3; *see* Tr. at 2:27–29.)

244. One conclusion that the Commission of Investigation reached was that every effort should be made to bolster the bidding and the implementation processes to foster competition and competitive prices. (Ex. D–2, at 6–8.)

245. The Commission of Investigation also recommended: "Where applicable, the process of obtaining quotes should not be used to parcel out work to favored vendors. All bus companies within a reasonable distance should be contacted to submit quotes." In addition, the Commission made other recommendations designed "to foster competition and to minimize conditions that breed collusion." (Ex. D–2, at 7–8.)

246. Laidlaw operates approximately 2000 school buses in New Jersey. The total number of school buses in New Jersey is approximately 15,000, possibly more. (Tr. at 1:98, 6:81.) Laidlaw has about 20% of the New Jersey market for the private school bus transportation industry. (Tr. at 2:20–21.)

247. There are over 200 private school bus contractors in New Jersey. This includes larger contractors as well as small local contractors. (Tr. at 1:99, 2:98, 6:75.)

248. In a few instances, Laidlaw has submitted bids to school districts in New Jersey that were unopposed. (Tr. at 2:102.)

**c. STA's New Jersey Operations**

249. In New Jersey, bidding for school bus contracts for the 1998/1999 school year occurs predominantly from May through August, 1998. (Tr. at 1:108.)

250. STA has not in the past operated, and is not currently operating, any school buses in New Jersey. (Tr. at 6:31.)

251. However, STA is currently competing with Laidlaw in New Jersey. (Tr. at 6:105.)

252. STA intends to expand its business in New Jersey. (Tr. at 6:105.)

253. Gallagher wrote to 375 school districts in New Jersey, including Laidlaw's customers, promoting STA and asking to be put on their list of bidders. (Tr. at 6:117; Ex. P–75.)

254. STA has bid on seven school district contracts for the 1998–99 school year: Lakewood, Hammonton, Freehold, Neptune, Vineland, Buena, and Lower Camden. STA bid head-to-head with Laidlaw in all of these school districts except Lakewood. (Tr. at 1:108, 6:32–37, 114–15.)

255. Four of the school districts STA bid on in New Jersey were customers of Coast Cities when Laidlaw acquired that company and remained Laidlaw customers at the time STA bid—Lower Camden, Neptune, Buena, and Freehold. (Tr. at 1:108, 2:98, 6:106; Ex. P–50, ¶ 15.)

256. STA has been awarded three contracts for school bus services in New Jersey for the upcoming 1998–99 school year: the Lakewood, Buena and Lower Camden school districts. STA does not currently own any school buses in New Jersey, but has ordered buses to fulfill its Lakewood (52 buses) and Buena (9–10 buses) contracts. There are also approximately 50 buses involved in the Lower Camden contract. In September, STA will operate approximately 110 buses in New Jersey. (Tr. at 6:90–91.)

257. As of July 8, 1998, it was not very likely, although not inconceivable, that STA would bid on additional school bus contracts in New Jersey for the 1998–99 school year because it would have been difficult for STA to obtain additional buses before the school year begins. (Tr. at 6:110, 115.)

#### d. STA's Effect on Competition in New Jersey

258. The presence of STA in the market as a provider of school bus services resulted in a lower contracting price in Buena, and it was directly responsible for the school district's savings of approximately $7,000 on the 1998–99 contract. (Ex. D–73, Coia Affidavit, ¶ 10.)

259. The presence of competition in Lower Camden resulted in a considerable savings to Lower Camden Regional on the 1998–99 contract. On each individual route, the school district saved about $6,000, with an overall savings to the school district of over $300,000. (Tr. at 1:155–57.)

260. The competition from STA for the contract in Neptune caused Laidlaw to lower its bid on the 1998–99 contract. (Tr. at 2:107.)

### 9. The School Bus Transportation Market in Pennsylvania

#### a. The Pennsylvania Process

261. Service related items do not have to be submitted to public bidding in Pennsylvania. A school district may choose, however, to seek public bids. The district can also choose to send out Requests for Proposals ("RFPs"). The school districts may send proposals to whomever they choose. With a proposal, the school board is not required to choose the lowest bidder. A third option in Pennsylvania is to negotiate without bidding. (Tr. at 2:183, 3:48; Ex. D–4, Affidavit of William R. Gretton, III (Business Administrator, Council Rock School District, Richboro, PA), ¶ 6; Ex. C–1T–B, at 94, Transcript of Council Rock, Pennsylvania School Board Meeting.[1])

262. The Pennsylvania school bus market differs from the New Jersey market because is not subject to mandatory public bidding. (Tr. at 1:110.)

263. In Pennsylvania, contracts are generally three to five years in length and the school district can negotiate extensions without soliciting proposals from any other contractors. (Tr. at 1:110.)

264. In Pennsylvania, a school district may choose the contractors from whom it will solicit proposals for school bus services. A school district may negotiate a contract without going through any bidding process or soliciting any proposals. (Tr. at 2:183, 3:48.)

---

1. All citations to the Council Rock board meetings refer to the transcription of the videotapes for the meetings that were provided by Defendants to the Court on July 10, 1998.

265. In contrast to a state which requires competitive bidding for school bus contracts, school districts in Pennsylvania can request proposals only from selected companies and may choose a contractor for reasons other than price. The school district does not have to advertise its request for proposals publicly and does not have to choose the lowest responsible bidder. (Tr. at 3:49, 55.)

266. The school district may choose the contractor that best suits its particular needs and concerns. (Tr. at 3:49.)

267. A school district can consider any number of factors, such as past history with a contractor, safety and reliability. The videotape of the Council Rock School Board meeting discussing the proposals and awarding the contract to Laidlaw shows clearly that the school districts do consider a number of factors and do not award a contract based solely on price. (Ex. C–1T–A, at 88–113; Ex. C–1T–B, at 95–114.)

**b. STA's Pennsylvania Operations**

268. Laidlaw has lost no contracts to STA in Pennsylvania. (Tr. at 2:16–17.)

269. STA operates only about 21 school buses in Pennsylvania. These buses were part of Global's acquisitions of Bortner and Ku, which are primarily motor coach businesses. The 21 buses that STA obtained through the Bortner and Ku acquisitions service the Shenango and Sharpsville school districts. Those school districts are not part of the four-county area in western Pennsylvania where Peter Pearson had previously worked for Laidlaw. (Tr. at 6:17, 37–39, 157–58.)

270. STA is competing with Laidlaw in Pennsylvania and plans to grow its business in Pennsylvania. Gallagher Deposition Designations, at 173; Pearson Deposition Designation, at 67.

271. In Eastern Pennsylvania, STA competed against Laidlaw in the Council Rock and Bristol school districts. (Tr. at 1:109, 3:35, 55, 6:38.)

272. Both Council Rock and Bristol were Laidlaw customers when STA solicited them for business. (Tr. at 1:110, 3:55.)

**10. STA Marketing**

273. In promoting themselves, Defendants draw on Laidlaw's goodwill. For example, STA's investment memorandum introduces Gallagher and Robert Byrne as follows:

Denis Gallagher has over 20 years of experience in the passenger transportation industry. Prior to co-founding Global, Denis served as Senior Vice President of Laidlaw's Passenger Services Group, the largest school bus company in North America.... Denis was the leader of Laidlaw's successful effort to privatize school district contracts and therefore has the knowledge and skill needed to win privatization contracts for STA....

Bob Byrne worked closely with Denis at Laidlaw and will complement Denis' skill set. Bob served as legal counsel to and secretary of Laidlaw Transit, Inc. and Laidlaw Medical Transportation, Inc. During his five year tenure at Laidlaw, Bob completed 105 acquisitions and 8 divestitures.

(Ex. P–8, at 1.)

274. The defendants' Investment Memorandum points to Laidlaw as a role model. (Ex. P–8, at 19.)

275. STA uses the "Gallagher Family Business" to promote itself in its marketing materials. (Tr. at 6:77.)

276. One STA advertisement is entitled "The Newest Choice in Transportation is Backed by a Name You Know and Trust." The advertisement goes on to promote STA by attributing to it the history of Gallagher Enterprises. (Ex. P–48.)

277. In STA's business development materials, the description of Gallagher's experience refers to his work at Laidlaw. (Ex. P–8; *see* Tr. at 2:134–35.).

278. STA used its employees' experience and success at Laidlaw to support its own efforts in the course of competing with Laidlaw for the contract with the Council Rock School District in Pennsylvania. During a meeting of the Council Rock School Board, Board Members expressed concerns about whether STA would be able to get buses and drivers in time. In response Terrence Srsen,

STA's Chief Operating Officer, responded: "[W]e have experience within our company of startups in excess of 350 bus routes in areas like Memphis and Little Rock, Arkansas, who are confident that we can meet the requirements, particularly with the labor rates that we have agreed to." (Tr. at 3:63; Ex. C–1T–A, at 97–98.) In fact, neither Memphis or Little Rock are customer's of STA; they were both Laidlaw customers and Laidlaw established the transportation systems in those school districts. (Tr. at 3:63.)

279. In response to further questions from Board Members expressing concern about contracting with a newly formed company, Srsen said that STA has a "wealth of experience, including, I might add, many of the people who led the Laidlaw organization prior to moving out into their venture now, and provided the good reputation that Mr. Ayoub [a Board Member] referred to earlier." (Ex. C–1T–A, at 98–99.)

280. During the course of the Council Rock School Board meeting, one of the Board members asked about STA's safety record. Srsen responded:

> The California operation has been the safest school bus operation for at least five years running. We believe that we have the best safety program in the industry. In fact, the individual that chairs our safety program, Fred Sprengle, was formerly with Laidlaw in this area and ran the Laidlaw safety program for them before joining our organization.

(Ex. C–1T–A, at 109.)

281. STA advertises and promotes itself to New Jersey school districts as a company that provides safe school buses and drivers as part of its efforts to convince school districts to convert from district-operated fleets to a private bus company. (Tr. at 6:78–80.)

282. The Gallaghers previously promoted Coast Cities as a safe company, using the slogan "Safe Vehicle, Safe Driver and Safe Students" and stated, "These three items have brought the company to the attention of Boards of Education throughout the state [of New Jersey] who are seeking higher levels of quality safe service." (Ex. P–70.)

## II. CONCLUSIONS OF LAW

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following conclusions of law:

### A. *Preliminary Matters*

#### 1. *Choice of Law*

■ A federal court sitting in diversity must apply the conflict of laws principles of the forum state, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), here, New Jersey. The Sales Agreement contains a provision stating that it is to be governed by the laws of New Jersey. Under New Jersey law, "[w]here a contract expresses a clear intent to have a particular jurisdiction's law govern, the parties' choice of law will apply unless it violates the public policy of New Jersey." *Haynoski v. Haynoski*, 264 N.J.Super. 408, 413, 624 A.2d 1030 (App.Div.1993) (citation omitted). Here, neither party suggests any public policy that precludes application of New Jersey law; in fact, the parties agree that New Jersey substantive law applies to the Sales Agreement. Given the interests of New Jersey in this case, and the agreement of the parties, the Court will apply New Jersey law to the Sales Agreement Non–Competition Agreements. *See id.*

■ The Stock Option Non–Competition Agreements state that they are to be governed by the laws of Ontario, Canada. In their briefing, however, Defendants explicitly, and Plaintiffs implicitly, seek to apply New Jersey law. (Defendants' Memorandum in Opposition to Laidlaw's Motion for a Preliminary Injunction ("P.I.Opp.Br.") at 23–24; Supp. P.I. Mov. Br. at 17–21.) Furthermore, at the preliminary injunction hearing, the parties agreed that New Jersey law would govern the stock-option non-competes. Thus, to the extent that the parties may have wished to argue that the laws of Ontario apply, they have waived that issue. *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1004 n. 1 (3d Cir.1980) (holding that parties waived any choice-of-law objection by not raising one).

### 2. Lack of Consistent Enforcement of Stock–Option Non–Competes

Defendants note that Laidlaw has not consistently enforced other stock-option non-competes. (*See* Defendants' Proposed Findings of Fact and Conclusions of Law ¶¶ 142–45.) Although the Defendants do not rely on this fact in their briefing or in their proposed conclusions of law, the Court wishes to make clear that Laidlaw's actions (or lack thereof) in other instances do not amount to a waiver or estoppel of its contract rights. One district court considering this issue found that an employer's failure to enforce a restrictive covenant against similarly situated employees did not estop the employer from enforcing the covenant. In *Minnesota Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324 (D.Minn.1980), the court found:

> All things considered, the failure of [the employer] to attempt to enforce similar covenants against other former employees is not overly probative of any intent to relinquish its contractual rights or to knowingly mislead [the employees] so as to estop [the employer] from enforcing the covenant in question. For the Court to hold otherwise would effectively place employers in the precarious position of being compelled to enforce all such restrictive covenants with respect to all its former employees, which might encourage attempts to restrain trade, and which might undermine labor relations.

*Id.* at 336. A similar rationale would apply here. Defendants' suggestion would require an employer to enforce every restrictive covenant, without regard to cost-effectiveness or individual circumstances. This is impractical and unfair, not only to Plaintiffs, but to other former employees, particularly here where the other former employees have not launched a collective effort that represents as great a competitive threat to Laidlaw as STA. Whether a restrictive covenant may be enforced depends on its reasonableness *under the particular circumstances. See Solari*, 55 N.J. at 576, 264 A.2d 53. Plaintiffs may or may not seek to enforce other covenants, but the primary inquiry is whether enforcement of the covenant in *this* case is reasonable.

### B. Preliminary Injunction Standards

Although New Jersey law governs the enforceability and interpretation of the non-competes, federal standards nonetheless govern requests to federal courts for a preliminary injunction. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 & n. 4 (3d Cir.1989) (citing *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131 (3d Cir.1977); 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2943).

The issuance or denial of a preliminary injunction is a matter committed to the sound discretion of the trial court. *Penn Galvanizing Co. v. Lukens Steel Co.*, 468 F.2d 1021, 1023 (3d Cir.1972). However, an injunction is "an extraordinary remedy which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989).

In ruling on a motion for a preliminary injunction, the court must be convinced that all four of the following factors favor preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer "irreparable harm" without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *Clean Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir.1995); *American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1426 (3d Cir.1994). The Court will consider each of these factors in turn.

### 1. Likelihood of Success on the Merits

### a. Sales Agreement Restrictive Covenants

### i. Expiration

The restrictive covenants in the Sales Agreement, to which Gallagher and Thomas Gallagher agreed, provide:

> The Covenantor covenants and agrees with Laidlaw that, for a period of five (5) years

from the date hereof, or if the Covenantor shall receive remuneration from Laidlaw or any of its affiliates after the date hereof, for a period of five (5) years from the date hereof or other date on which the Covenantor last receives remuneration from Laidlaw, whichever is later.

(Exs.2–3, ¶ 1.)

Defendants argue that the restrictive covenants in the Sales Agreement have long since expired. Defendants interpret the Sales Agreement to mean that Gallagher's five-year restrictive covenant ran from the later of: (1) the date of the Sales Agreement; and (2) the date he received the last installment of the $1 million consideration for the non-compete. Defendants contend that since the only remuneration to Gallagher in the Sales Agreement is the $1 million, then the remuneration referred to in the restrictive covenant must refer only to that $1 million.

■ In support of their interpretation, Defendants offer parol evidence, namely, conversations between Ferreri and Gallagher during the negotiations over the Sales Agreement regarding the meaning of the non-compete. The Court, over the objection of Laidlaw, admitted this parol evidence to explain the meaning of "remuneration," finding that the term remuneration is somewhat ambiguous.

While the term remuneration is ambiguous, i.e., reasonably susceptible to more than one meaning, the Court finds that it cannot be limited to the $1 million consideration for the non-competes. First, although Gallagher testified that Ferreri told him and that it was his understanding that the 5 years ran from the date of the last payment on the $1 million, this understanding came from preliminary negotiations with a person who only had authority to enter into preliminary negotiations and the confidentiality agreement. There is no question that Gallagher knew that the attorneys for Laidlaw and his attorneys were drafting the actual terms of the Sales Agreement and the Non–Competition Agreement. Any reliance on preliminary negotiations was unwarranted here, where, as will be explained below, the language of the non-compete simply cannot support the construction Defendants seek to give it.

Furthermore, the Court finds credible Jamison's testimony that Gallagher told him that it was Laidlaw's position that the sale of business non-competes ran from the time the seller left Laidlaw's employment. Although Gallagher may not have been specifically referring to his own non-compete, he was discussing the general term found in many of the Laidlaw acquisition agreements, including his own.

Ultimately, however, regardless of Gallagher's actual understanding, the Court finds that the parol evidence Defendants offer cannot be used to give the non-competes the meaning Defendants seek to give it because such a construction makes absolutely no sense in light of the language of the contract.

The term "remuneration" as used in the Sales Agreement could not possibly be limited to the $1 million consideration for the non-competes. The Sales Agreement required Laidlaw to pay Gallagher the $1 million. It was not, in any way, a conditional payment. Therefore, the non-competition provision would not have read, "or, *if* the covenantor shall receive remuneration" if the remuneration referred to the $1 million required payment. Since the agreement clearly contemplates potential remuneration, it had to be referring to the possibility of some other remuneration (in other words, compensation for the Gallaghers' future employment by Laidlaw).

Defendants' contention that the only remuneration the Sales Agreement contemplates is the $1 million consideration is a gross misreading of the Agreement. The Agreement absolutely contemplates other remuneration. (*See* Ex. P–1, Sales Agreement ¶ 7.01(h) ("The Company shall employ Denis Gallagher, on a full-time basis, for two years commencing at Closing. During that period and provided Denis Gallagher is working full time for the Company, *the Company shall pay him at an annual salary of $100,000 ....*") (emphasis added); *see also id.* ("The Company shall employ Thomas Gallagher, on a full-time basis, for two years commencing at Closing. During that period and provided Thomas Gallagher is working full time for

the Company, the Company shall pay him at an annual salary of $50,000 ....").)

Further evidence against Defendants' construction is that the parties used the word "remuneration" as opposed to "consideration" or "the $ 1 million," etc. Remuneration is much broader than consideration for a sale. It means: "Payment; reimbursement. Reward; recompense; salary; compensation." *Black's Law Dictionary* 1296 (6th ed.1990). Defendants point to nothing in the Agreement that suggests that remuneration is more restrictive than its basic definition.

Finally, Defendants' reading also fails to make sense because the date of the payments on the $1 million was fixed. The last installment on the $1 million for the non-compete was due January 1, 1989. If the parties intended that the non-competition agreement began to run from that date, the date Gallagher received the last installment, then it seems likely that it would have said so. There would be no reason to use the conditional and imprecise language that the parties used if they meant for the non-compete to expire on January 1, 1994, five years after January 1, 1989.

■ Thus, while remuneration is ambiguous and might be capable of more than one meaning, it cannot possibly mean only the $1 million consideration. Parol evidence may explain an ambiguous term, it may not, however, vary or alter the terms of the Agreement.

Under New Jersey law:

Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. *Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant.* The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose.

*Atlantic N. Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 301–02, 96 A.2d 652 (1953) (citing *Casriel v. King*, 2 N.J. 45, 65 A.2d 514 (1949)); *accord Gray v. Joseph J. Brunetti Constr. Co.*, 266 F.2d 809, 815 (3d Cir.1959) (quoting *Schwimmer*, 12 N.J. 293, 96 A.2d 652); *see also Storwal Int'l v. Thom Rock Realty Co., L.P.*, 768 F.Supp. 429, 431 (S.D.N.Y.1991) ("If a court determines that language is susceptible of two interpretations and is therefore ambiguous, then parole evidence is admissible, not to vary the terms of the [agreement], but to aid in construing the ambiguous language.") (citing *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 n. 2 (2d Cir.1975)).

Reading ¶ 1 of the Sales Agreement non-competes as Defendants do would not only interpret remuneration, but would improperly read out of the paragraph the conditional language. For the foregoing reasons, the Court finds that the restrictive covenants ancillary to the Sales Agreement expire five years from the last date the Gallaghers received a salary from Laidlaw. Accordingly, Gallagher's covenant not to compete began to run on April 1, 1996 and Thomas Gallagher's covenant not to compete began to run in late 1997.

ii. *Enforceability of the Sales Agreement Non–Compete*

Although the Court holds that the non-compete runs from when the Gallaghers left the employ of Laidlaw, the Court must still determine whether the non-competes are enforceable under New Jersey law.

Although "a covenant by an employee not to compete after the termination of his employment is not . . . freely enforceable, it will nonetheless be given effect if it is reasonable in view of all the circumstances of the particular case." *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 576, 264 A.2d 53 (1970). An employee's covenant not to compete "will generally be found to be reasonable where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Id.* (citations omitted); *see also Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 32–33, 274 A.2d 577 (1971); *Ingersoll–Rand Co. v. Ciavatta*, 110 N.J. 609, 628–30, 542 A.2d 879 (1988) ("In *Solari* and *Whitmyer*, we articulated a three-part test to determine the validity of a noncompetition covenant in an employment contract.").

Furthermore, "if such a covenant is found to be overbroad, it may be partially enforced to the extent reasonable under the circumstances." *Davidson Bros., Inc. v. D. Katz & Sons, Inc.*, 121 N.J. 196, 212, 579 A.2d 288 (1990) (citing *Solari*, 55 N.J. at 585, 264 A.2d 53); *see also Coskey's Television & Radio Sales and Serv., Inc. v. Foti*, 253 N.J.Super. 626, 634, 602 A.2d 789 (App.Div.1992) ("Even if the covenant is found enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity.") (citing *Solari*, 55 N.J. at 585, 264 A.2d 53).

In contrast, covenants ancillary to the sale of a business "are accorded far more latitude" than restrictive covenants ancillary to an employment contract. *Coskey's*, 253 N.J.Super. at 633, 602 A.2d 789. Sound reasons support this different treatment:

> [I]f a retail store is purchased at a particular location, the seller receives payment for the good will generated at that location, recognizing that customers would be inclined to continue shopping at the facility. *See Heuer v. Rubin*, 1 N.J. 251, 256, 62 A.2d 812 (1949). For the seller to thereafter trade on that good will by reopening within the competitive area would destroy the essence of the transaction.

*Id.* Sale of business restrictive covenants, therefore, are "freely enforceable." *Solari*,

55 N.J. at 576, 264 A.2d 53; *see also Meadox Medicals, Inc. v. Life Sys., Inc.*, 3 F.Supp.2d 549, 552 (D.N .J.1998) ("New Jersey courts freely enforce restrictive covenants against sellers of businesses because the buyers paid separate consideration for the sellers' good will, which is protected through the covenant. In such a case, the buyer is in essence purchasing the seller's customer relationships outright. The restrictive covenant protects the buyer's bargained-for assurance that the seller will not retain that which he has sold."). Nonetheless, courts, in examining sale of business non-competes, should perform the three part *Solari/Whitmyer* test, albeit more flexibly. *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F.Supp. 683, 691 (D.N.J.1993) ("However, notwithstanding the deference given to restrictive covenants made in connection with the sale of a business, there is no indication that New Jersey law denies to the court the right to 'blue pencil' such a covenant to insure that it is reasonably tailored to meet the *Solari* test of reasonableness.") (citation omitted).

### (a) Categorization

A threshold issue that must be addressed is how to categorize the Sales Agreement non-compete. Obviously, since it is part of the Sales Agreement, it has some elements of a standard non-competition agreement ancillary to a sale of business. However, since the non-compete runs from the end of a term of employment, it also shares elements with an employment non-compete.

The Ninth Circuit has addressed a similar situation. In *Business Records Corp. v. Lueth*, the plaintiff purchased the individual defendant's business. 981 F.2d 957, 958–59 (7th Cir.1992). The defendant also went to work for the plaintiff. As part of the purchase agreement, the defendant signed a covenant not to compete that was in effect until "the later of (i) the third anniversary of the date of this Agreement or (ii) the second anniversary of the [defendant's] termination of an employee of [the plaintiff]." *Id.* at 959.

The Ninth Circuit analyzed the covenant not to compete as follows:

> The covenant here can be characterized as a covenant to a purchaser. There is one

twist, however. The agreement called for the covenant to expire on the later of three years from the date of purchase or two years from the date of quitting. The aspect of the covenant that relates to the period after the date of purchase obviously relates to protection of the buyer. On the other hand, the part that bars competition for two years after the date of quitting sounds more like a provision to protect an employer from a renegade employee than one to protect a purchaser from an unscrupulous seller. *The covenant for two years beyond the date of quitting is therefore considerably more difficult to justify than the covenant for three years beyond the sale.* Consider if [the defendant] had worked for [the plaintiff] for twenty years before quitting. According to the covenant he would not be able to compete against [the plaintiff] for two years past his quitting date. *But by that time [the plaintiff's] need to protect its purchase would be long gone, and it would be procrustean to say that the covenant was one for the protection of a purchaser as such.*

If [the Plaintiff] had sought to enforce the covenant in those circumstances a court might well have held it unreasonable to do so. In the case before us, however, [the defendant] worked only six years for [the plaintiff], so we need only decide if the restriction was reasonable given the present facts....

*Id.* at 960–61. The court affirmed the district court's enforcement of the restrictive covenant, concluding that since the plaintiff had made a significant investment in preserving the defendant's loyalty and had built on the goodwill of the acquired company, eight years of no competition was not unreasonable. *Id.* at 961.

Granted, a few courts have treated non-compete provisions analogous to the Sales Agreement non-competes as ancillary to a sale of business and have enforced it as such at the preliminary injunction stage. *See, e.g., Williams v. Powell Elec. Mfg. Co., Inc.,* 508 S.W.2d 665 (Tex.Ct.Civ.App.1974) (where sellers of a business also entered into employment contracts and ancillary covenants not to compete for five years after the termination of their employment with the buyer, court affirmed trial court's granting of a preliminary injunction enforcing non-compete, in large part, on the ground that the non-competes were ancillary to the sale of a business, and as such, were not subject to as stringent a test of reasonableness as that applied to employment non-competes); *Alabama Binder & Chem. Corp. v. Pennsylvania Indus. Chem. Corp.,* 410 Pa. 214, 189 A.2d 180 (1963) (same, but with respect to a single seller). However, those cases did so without addressing the problems recognized by the *Lueth* court. The Court finds the Ninth Circuit's analysis persuasive. Thus, this Court must now consider whether under the facts before it, the covenant not to compete is reasonable.

(b) *Protectible Interests*

■ The Court finds that Laidlaw *no longer* has a protectible interest in the purchased good will. The Court emphasizes the phrase no longer because, notwithstanding Defendants' vigorous arguments to the contrary, the Court finds that goodwill exists and has some importance in the New Jersey school bus business. Concededly, goodwill is not relevant in a system that is purely the direct submission of public bids, where the only question is which applicant is the lowest responsible bidder. *See Whitmyer,* 58 N.J. at 38, 274 A.2d 577; *Coskey's,* 253 N.J.Super. at 635, 602 A.2d 789. New Jersey school busing, however, does not involve such a system. School boards do not have to open their bus contracts to public bidding every single year. As previously discussed, the school districts have the ability to renew provided that the renewal price represents less than a 30% increase over the original contract. Thus, good will, past service, and customer relationships can and do play a role in whether the school board will choose to renew or to open the contract up for a bid.

Defendants' own actions belie their contentions that good will is completely irrelevant. The evidence has shown that STA people, who were former Laidlaw employees, have gone to New Jersey school districts in which they have contacts from their Laidlaw days to try and convince them not to renew with

Laidlaw, but to open the bidding to give STA a chance at obtaining the contract. Furthermore, STA's marketing efforts also clearly show that a good reputation is not completely irrelevant. (*See supra* Findings of Fact Nos. ¶¶ 273–81.) For example, STA currently advertises and promotes itself to New Jersey school districts as a company that provides safe school buses. Even Coast Cities old advertising slogan, "Safe Vehicle, Safe Driver and Safe Students" shows that good will is a factor.

However, while good will has a role in the school bus industry, particularly with respect to renewals, it is not as important as it is in other industries. The Court finds that good will is irrelevant once a school board opens a contract for bidding. Plaintiff's efforts to make the term responsible in "lowest responsible bidder" into a substantial and material standard are without avail. The Court recognizes that in discussing another industry the New Jersey Supreme Court opined:

> The responsibility of a bidder is not merely a prerequisite to the award of a contract to the lowest bidder, it carries equal, if not more weight. Indeed, there are many instances where the 'lowest bidders' will not receive the contract because they are not the most 'responsible' bidder.

*N.E.R.I. Corp. v. New Jersey Highway Auth.,* 147 N.J. 223, 241–243, 686 A.2d 328 (1996) ("The term 'responsible' refers to the bidder's quality, fitness, and capacity to satisfactorily perform the proposed work.") (citations omitted). In the school bus industry, however, there is no evidence whatsoever that any school district has ever rejected a bidder for failing to be responsible, let alone a bidder that is well-known in the industry. More importantly, nothing Defendants have done or might ever do could raise even the faintest of doubts that Laidlaw, the nation's largest school bus contractor, is not a "responsible" bidder. To the extent that Laidlaw's status as "responsible" is a protectible interest, it does not need to prevent competition from STA and Gallagher to protect that interest.

Since at the time of the Sales Agreement Laidlaw had a protectible interest in the purchased good will, the question becomes at what point does Laidlaw's need to protect its purchase cease to exist?

The length of time that is reasonable in order to protect goodwill varies under the circumstances. In *Jiffy Lube,* the Court found that after the termination of a franchise, a three year period of non-competition was excessive in terms of protecting Jiffy Lube's goodwill. 834 F.Supp. at 691–92. The Court found that "[t]en months [was] more than sufficient time for Jiffy Lube to find and set up another franchisee in the Turnersville area—free from any competition from the defendants." *Id.* at 692. In *Lueth,* the Ninth Circuit upheld the enforcement of a restrictive covenant that effectively gave the purchaser of a business 8 years of protection of the purchased good will. 981 F.2d at 960. The *Lueth* Court also noted that after twenty years, the need to protect the purchased good will would be "long gone." *Id.; cf. Rasmussen Heating & Cooling, Inc. v. Idso,* 463 N.W.2d 703, 705 (Iowa Ct.App. 1990) (refusing to enforce covenant not to compete in a sale-of-business agreement, because "[the] ten-year covenant is neither tightly time limited nor reasonably necessary for the protection of the business," and the five years prior to the defendant's competing business activities had been ample); Timothy D. Scrantom & Cherie L. Wilson, *Postemployment Covenants Not to Compete in South Carolina: Wizards and Dragons in the Kingdom,* 42 S. Car. L.Rev. 657, 687 n.113 (1991) (noting that in South Carolina, "[c]ovenants not to compete in connection with the sale of businesses are commonly assumed to be enforceable for up to five years.").

From the time of the Sales Agreement until the formation of STA, Plaintiff had from October 9, 1987 until May 1997, more than nine and a half years (of which at least one was after Gallagher left Laidlaw) in which to make the goodwill of Coast Cities and Gallagher Enterprises its own. The Court finds that this period is well beyond the time in which a buyer in a sale of a school bus business has a protectible interest in the purchased good will. Since the Court determines that nine and a half years is more than ample, the Court need not determine the

exact amount of time for which the restrictive covenant would be enforceable. Whatever the longest period would be, it is shorter than nine and a half years.

■ Ordinarily, if a restrictive covenant is overly broad or unreasonable, the Court may "limit[ ] ... its application concerning its geographical area, its period of enforceability, and its scope of activity," *Coskey's*, 253 N.J.Super. at 634, 602 A.2d 789 (App.Div. 1992) (citing *Solari*, 55 N.J. at 585, 264 A.2d 53), to make it reasonable. Although a Court normally engages in blue penciling on a final determination of the merits, federal courts have routinely blue-penciled a restrictive covenant in granting a preliminary injunction that enforces the more limited restrictive covenant. *See, e.g., Weseley Software Dev. Corp. v. Burdette*, 977 F.Supp. 137 (D.Conn. 1997); *South Nassau Control Corp. v. Innovative Control Mgmt. Corp.*, No. 95–CV–3724 (DRH), 1996 WL 496610 (E.D.N.Y. June 20, 1996); *Hillard v. Medtronic, Inc.*, 910 F.Supp. 173 (M.D.Pa.1995); *Jiffy Lube*, 834 F.Supp. at 692.

Thus, while this Court has the power to blue pencil the Sales Agreement non-compete, the Court concludes that blue penciling is not appropriate. As previously found, Laidlaw no longer has a protectible interest in the goodwill of Gallagher Enterprises and Coast Cities. It has already had more than nine and a half years to make their goodwill its own. Laidlaw is not entitled to any more protection.

Plaintiff also argues that it has a protectible interest in preventing Gallagher from using the vast amounts of confidential and proprietary information that Gallagher possesses as well as his customer relationships. (Reply Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("P.I.Rep.Br.") at 11–12; Plaintiffs' Proposed Conclusions of Law ¶ 31.)

■ It must be remembered that restrictive covenants are restraints of trade. The law looks unfavorably towards such restraints. Under New Jersey law, restrictive covenants ancillary to a sale of business are an exception to the rule and are more freely enforceable than those ancillary to employment, solely to protect the purchased good will. *Coskey's*, 253 N.J.Super. at 633, 602 A.2d 789. Confidential information obtained and customer relations developed during an after-sale employment relationship, while representing protectible interests, *see Whitmyer Bros.*, 58 N.J. at 33, 274 A.2d 577 ("the employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships"); *Ingersoll–Rand*, 110 N.J. at 628, 542 A.2d 879 (same), are not part of the sale of the business. Accordingly, Plaintiffs are not entitled to the normal deference due to sale of business non-competes when seeking to justify the non-competes based on interests solely arising out of the employment relationship that occurs after the sale of the business.

The *Ingersoll–Rand* court provided a very helpful discussion of protectible interests in the employment context, from which this Court will quote at length:

The first two parts of the *Solari/Whitmyer* test focus on the protection of the legitimate interests of the employer and the extent of the hardship on the employee. Plainly, the court must balance these competing interests. In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive agreement. Conversely, in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable. Courts also recognize that knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person.... An employee can use those skills in any business or profession he may choose, including a competitive business with is former employer. Courts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee....

. . .

Most courts have limited the legitimate protectible interests of an employer "to trade secrets and other proprietary information ... and customer relations." *See, e.g., Solari Indus., Inc. v. Malady, supra; Whitmyer Bros., Inc. v. Doyle, supra* ....

. . .

Ingersoll–Rand, however, argues that it is inequitable to limit an employer's "protectable interest" solely to trade secrets and other confidential information. Today, large corporations maintain at great expense modern research and development programs that involve synergistic processes. Such "think tanks" require the free and open exchange of new ideas among the members of a research staff using the employer's body of accumulated information and experiences.... We agree with Ingersoll–Rand that the protection afforded by holdover agreements such as the one executed by the parties in this lawsuit may under certain circumstances exceed the limitation of trade secrets and confidential information. We recognize that employers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been "exposed" and "enriched" solely due to his employment. We do not attempt to define the exact parameters of the protectable interest.

We expect courts to construe narrowly this interest, which will be deemed part of the "reasonableness" equation. The line between such information, trade secrets, and the general skills and knowledge of a highly sophisticated employee will be very difficult to draw, and the employer will have the burden to do so.

*Ingersoll–Rand,* 110 N.J. at 635–38, 542 A.2d 879 (citations omitted).

██ Although the individual Defendants have signed agreements that acknowledge that they received confidential information at Laidlaw, this Court is not bound by the terms of these agreements that were drafted by Laidlaw. A contractual provision simply cannot act as a substitute for a finding by this Court that determines whether a preliminary injunction is proper. *Cf. Dice v. Clinicorp., Inc.,* 887 F.Supp. 803, 809 (W.D.Pa. 1995) ("This Court is not bound by the terms of the Employment Agreement in which the parties agreed that a violation of the covenants would constitute irreparable harm and that Mid–Atlantic would be entitled to an injunction. A contractual provision simply cannot act as a substitute for a finding by this Court that it would be appropriate to invoke its equitable powers.") (citation omitted); *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 808 F.Supp. 894, 900 (D.Mass.1992) (holding that to determine whether a patent licensee had an exclusive license, and thus had standing to sue for infringement, "the Court must examine the legal effect of the substantive provisions of the license agreements[;][i]t is not dispositive that these agreements characterize [the] license as 'an exclusive license' "), *aff'd sub nom. Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.,* 52 F.3d 1026 (Fed.Cir.1995). Similarly, while STA may also, in its agreements, claim that it divulges confidential information to its employees, the Court must conduct an independent analysis to determine whether Laidlaw has a protectible interest that justifies enforcing the Sales Agreement non-competes.

██ Plaintiffs claim that Gallagher possesses a vast amount of proprietary and confidential information. Specifically, they claim:

As Laidlaw's Senior Vice President of Operations for the East Coast, Denis Gallagher obtained critical confidential information. For example, he knows the debt level, strategic plans, internal rates of return, profitability margins, safety programs, maintenance policies and information regarding future growth of the company. He knows the profitability of each Laidlaw facility in the East Coast Area, the cost structure of each bid, Laidlaw's objective with respect to each bid and every component that goes into a given bid.

. . .

As Senior Vice President of Operations, Denis Gallagher was involved at the highest levels of Laidlaw's operations and acquired confidential, proprietary and strategic information about all aspects of Laidlaw's school bus business. In that position, he was responsible for, among other things: (1) directing, administering and coordinating regional operations for the East Coast region; (2) developing and implementing policies, operating procedures, long range objectives and financial performance criteria; (3) consulting with senior management; (4) developing regional strategic plans for the East Coast Area; (5) developing annual regional operating and business and financial plans; (6) implementing all plans and programs; (7) ensuring quality service to customers; (8) maintaining customer relations and (9) communicating regularly with the President and Chief Operating Officer.

. . .

Laidlaw kept no information secret from Denis Gallagher. He had access to all of Laidlaw's models, development of bids, marketing strategies, business plans, purchasing plans, supplier contracts, internal rates of return, business strategies and good and poorly performing contracts and markets.

(Plaintiffs' Proposed Findings of Fact ¶¶ 90, 92, 98 (citations omitted).)

Much of this information, however, is either irrelevant, not confidential, or may have been confidential, but is now stale. With respect to the Maintenance Manual, Drivers' Training Manual, and Conversion Manual, Gallagher never read them, did not take them when he left Laidlaw, and has not seen them at STA. To the extent that they are confidential, Gallagher does not possess them and cannot make use of them. Additionally, the Conversion Manual is not confidential since it involves basic salesmanship. The Court also finds that the fill in the blank Bid Worksheet is not confidential since it does not have any confidential cost information on it and Laidlaw distributes it to school districts without confidentiality restrictions.

Laidlaw also claims that Gallagher knows Laidlaw's hurdle rates, business and strategic plans, route tying information, and the labor costs, equipment costs, and all the other costs and components that go into Laidlaw's bids. The Court recognizes that generally, "pricing and cost information provided to [a defendant employee is] . . . confidential because if it were known to competitors, they would be in a position to underbid the plaintiff and consequently win the contracts that plaintiff was competing for." *Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.,* 783 F.Supp. 53, 70 (E.D.N.Y.1991) (quoting *Support Sys. Assocs., Inc. v. Tavolacci,* 135 A.D.2d 704, 522 N.Y.S.2d 604, 605–06 (2d Dep't 1987)).

Here however, the hurdle rates, route tying information, and all the costs that go into a bid vary for every single district. Gallagher did not take with him any documents containing these figures. Rather, Laidlaw is basically arguing that a top executive, responsible for the entire East Coast of the largest school bus contractor in North America, would remember a material amount of the particular individual costs and components of particular bids even though they were different for every single school district. Gallagher would have to be the Rainman to be able to retain, recall, and make use of those myriad figures.

To make the matter more absurd, every cost and every component in every bid can and does change every year. Hurdle rates, labor costs, route tying, equipment costs, and other costs can and do change every single year in every single district. Thus, to the extent that Gallagher might somehow be able to make use of the then confidential information he saw at Laidlaw, that information is at least two years old and stale. In order for Gallagher to benefit from any of the confidential information to which he personally had access at Laidlaw, not only would he have to remember what the figures were for particular components of a particular bid in a particular school district in New Jersey, but he would also have to determine how each of those figures has changed over the last two years. The Court simply does not believe such a feat is possible.

The Court concludes that what Laidlaw really seeks to prevent is not Gallagher's use

of confidential information, but his competition. Gallagher represents a serious threat to Laidlaw because he knows the New Jersey school bus business and he knows how to bid competitively. "An employer[, however,] may not prevent an employee from using the general skills in an industry which have been built up over the employee's tenure with the employer." *Coskey's,* 253 N.J.Super. at 637, 602 A.2d 789; *see also Raven,* 195 N.J.Super. at 213–14, 478 A.2d 1208 (holding that trade secrets or confidential information "cannot merely be the facility, skill or experience learned or developed during an employee's tenure with an employer.") (citations omitted).

Furthermore, it also appears that Laidlaw is more concerned with Gallagher's general knowledge of the intricacies of Laidlaw's business operation rather than his knowledge of specific confidential information. This general knowledge of Laidlaw's inner workings alone, however, does not create a protectible interest sufficient to justify the enforcement of a restrictive covenant. *See Data Communication, Inc. v. Dirmeyer,* 514 F.Supp. 26, 33 (E.D.N.Y.1981).

Additionally, Gallagher possessed much of his knowledge, skill, experience, and understanding of the New Jersey school bus industry prior to coming to Laidlaw. While Laidlaw may have purchased the goodwill of Gallagher Enterprises, Laidlaw did not purchase for all time Gallagher's individual knowledge, skill, and experience. With respect to these qualities, and paraphrasing from the *Coskey's* court's discussion:

> What [Gallagher] brought to his employer, he should be able to take away. This is little different than the tradesman who brings his tools to his employer and upon separation leaves with them, or a scientist who has entered into an employment relationship with a head full of scientific data which he used for the benefit of his employer and then may use for the benefit of another upon reemployment. "Princeton is not to have the exclusive right to Einstein's services just because he is Einstein."

*Coskey's,* 253 N.J.Super. at 637–38, 602 A.2d 789 (quoting *Corbin on Contracts* § 1391B, at 610 (Supp.1989)).

Thus, weighing against Laidlaw's legitimate interest in protecting information about its costs and pricing are that: (1) Gallagher did not take any confidential documents containing this information; (2) it is exceptionally difficult to make use of the information; (3) the information quickly stales; and (4) the public has an interest in fostering competition in the school bus industry; *see infra* § II.B.1.a.ii.(d). Accordingly, the Court finds that the limit of reasonableness for a restrictive covenant to protect Laidlaw's confidential and proprietary information is one year, which Plaintiffs have already had.

Plaintiffs also argue that Laidlaw has a protectible interest in the customer relationships that Gallagher developed while at Laidlaw. For an employer to have a reasonably protectible interest in customer relationships under a restrictive covenant, then there must be evidence that the employer's customers represent "a significant investment of time, effort and money which is worthy of protection." *A.T. Hudson & Co., Inc. v. Donovan,* 216 N.J.Super., 426, 434, 524 A.2d 412 (App.Div.1987); *see Coskey's,* 253 N.J.Super. at 637–39, 602 A.2d 789.

The Court finds that Plaintiffs have met this burden. From STA and Gallagher's actions, as well as Laidlaw's, it is clear that in the context of renewals (and to a lesser extent, conversions), school bus contractors do invest a substantial amount of time, money, and effort in developing customer relationships. The Court therefore concludes that Laidlaw does possess a legitimate and protectible interest in its customer relationships sufficient to justify enforcement of a properly limited restrictive covenant. *See A.T. Hudson,* 216 N.J.Super. 426, 434, 524 A.2d 412.

As the Court found with good will, however, the Court holds that while customer relationships have some importance in the New Jersey school bus industry, customer relations are not as important as they are in other industries that do not involve public bidding and a lowest responsible bidder re-

gime. In addition, Laidlaw has made no showing that any of Gallagher's relationships with particular New Jersey school districts developed as a result of his employment with Laidlaw, as opposed to his experience at Coast Cities. Indeed, Laidlaw has focused its efforts on showing that several of the contracts on which STA bid were for school districts that were former Coast Cities customers. (See Plaintiffs' Proposed Findings of Fact ¶¶ 247–48.) Although Gallagher may have been responsible for customer relations, Laidlaw has not argued that he ever had substantial direct contact with New Jersey school districts in his most recent positions. With these considerations in mind, the Court holds that, at most, the one year plus that Laidlaw has had from the time Gallagher left until the time STA formed is all Laidlaw is reasonably entitled to in order to protect its legitimate interests. *Cf. Jiffy Lube,* 834 F.Supp. at 692 (holding that the three year term of a restrictive covenant ancillary to a franchise agreement was excessive when measured against the franchisor's protectible interests and reducing it to ten months, which the court found to be more than sufficient to protect its interests); *J.H. Renarde, Inc. v. Sims,* 312 N.J.Super. 195, 202, 711 A.2d 410 (Ch.Div.1998) (finding 9 month employee non-compete reasonable); *Platinum Mgmt., Inc. v. Dahms,* 285 N.J.Super. 274, 299, 666 A.2d 1028 (L.Div.1995) (holding that one year employee non-compete was reasonable); *Hogan v. Bergen Brunswig Corp.,* 153 N.J.Super. 37, 42, 378 A.2d 1164 (App.Div. 1977) (employee concedes that one year restrictive covenant was not unreasonable in terms of time component). Although New Jersey Courts have upheld longer restrictive covenants, *see, e.g., A.T. Hudson & Co., Inc. v. Donovan,* 216 N.J.Super. 426, 524 A.2d 412 (upholding two year covenant); *Mailman, Ross, Toyes and Shapiro v. Edelson,* 183 N.J.Super. 434, 444 A.2d 75 (Ch.Div.1982) (upholding a two year covenant without geographic limitation, but which only prohibited interference with the employer's present clientele), here, where the confidential information is stale and essentially unusable after one year (when the figures all change), a year is all that is reasonably necessary to protect Plaintiffs' legitimate interests.

Thus, the Court concludes that Laidlaw no longer has a protectible interest in Gallagher's Sales Agreement non-compete. Accordingly, the Court finds that Plaintiffs do not have a likelihood of success in enforcing Gallagher's non-compete. For similar reasons, the Court finds that there is no likelihood of success that Thomas Gallagher's non-compete is enforceable.

■ With respect to Thomas Gallagher's non-compete, in addition to what has been said about Gallagher, the Plaintiffs have made no showing that Thomas Gallagher has obtained confidential information from or developed customer relationships at Laidlaw. There is also no evidence that Thomas Gallagher is currently competing against Laidlaw in a way that makes use of any of Laidlaw's proprietary information or customer relationships; accordingly, Plaintiffs do not have a reasonable likelihood of showing that they are entitled to enforce the restrictive covenant.

#### (c) *Undue Burden*

■ Although the Court finds that Laidlaw no longer has a protectible interest, and thus, concludes that it cannot enforce the Sales Agreement non-competes at this time, the Court analyzes the remaining *Solari/Whitmyer* factors and preliminary injunction requirements to present a complete analysis. "Undue hardship" has been interpreted to mean that the restrictions imposed are disproportionate, compared to what is necessary to protect the legitimate interest of the party enforcing the covenant. *See Coskey's,* 253 N.J.Super. at 636, 602 A.2d 789. Thus, in light of the Court's previous discussion, the Court finds the Sales Agreement non-compete is unreasonably burdensome in comparison to what is necessary to protect the Laidlaw's legitimate interests.

Assuming, however, that Laidlaw has a protectible interest in the Sales Agreement non-compete that extended beyond the one year between Gallagher's departure from Laidlaw and the formation of STA, and beyond the time that Gallagher and STA first began competing with Laidlaw in the New Jersey school bus industry, the Court finds

that the non-compete imposes no unreasonable burden on Gallagher. First, Gallagher is only restricted from competing in a school bus business in New Jersey, the state that Gallagher Enterprises and Gallagher had extensive business interests. Gallagher and STA could conduct their school bus business in every other state. Furthermore, Gallagher could engage in businesses other than this one. Since Gallagher is Chairman and CEO of Global, and STA comprises only 10% of Global's business, then it is not as if Gallagher is left without any other options if he were bound by the non-compete.

Finally, Gallagher was handsomely rewarded for the non-compete. Given that Gallagher never made more than $175,000 a year at Laidlaw, the $1 million consideration more than adequately compensates Gallagher for the 5 years he is kept out of commission. In light of this substantial consideration, Gallagher's burden, while not insubstantial, does not strike this Court as undue.

### (d) *Public Interest*

 The New Jersey Supreme Court has stated that "[t]he practice of public bidding is universally recognized and deeply embedded in the public policy of this State." *N.E.R.I.,* 147 N.J. at 236, 686 A.2d 328. Thus, the public interest is furthered when courts "guard against favoritism, improvidence, extravagance, and corruption" and when competitive bidding is fostered. *Id.* Furthermore, the Commission of Investigation has found serious problems with the level of competition in the school bus transportation industry. Not only is there a clear need for increased competition generally, but one of the specific problems that the Commission of Investigation found was that large multi-state companies are buying out smaller companies, exactly as Laidlaw does.

Despite these considerations, the Court finds that, assuming the Sales Agreement non-competes are otherwise enforceable, the public interest does not bar their enforcement. To say that the Sales Agreement non-competes are unenforceable as against the public interest is tantamount to saying that sale of business non-competes are unenforceable in the school bus industry. If sale of business non-competes were not permitted in the school bus industry, the acquiring company would have great difficulty protecting the goodwill it has purchased. Aside from the inequity of not allowing the purchaser to protect the goodwill it purchased, companies would be discouraged from acquiring other companies, thereby depriving school districts of potential savings that ordinarily flow from the economies of scale attendant upon acquisition and consolidation. Faced with the inequitable and potentially detrimental results to the parties and the community that might result from adoption of a *per se* rule against non-competes in this industry, the Court believes that the New Jersey Supreme Court would reject such an approach. *Cf. Karlin v. Weinberg,* 77 N.J. 408, 422, 390 A.2d 1161 (1978) (refusing to adopt a *per se* rule against employment non-competes involving physicians based on analogous considerations). Since public policy is implicated, however, the Court has given these non-competes close scrutiny to ensure that the covenants are no broader than necessary. *Cf. Phoenix Orthopaedic Surgeons, Ltd. v. Peairs,* 164 Ariz. 54, 60, 790 P.2d 752 (Ct.App.1989) ("We agree that employment covenants restricting physicians in the practice of medicine involve public policy implications and should therefore be closely scrutinized. We reject, however, Dr. Peairs' suggestion that all such covenants not to compete are unenforceable as against public policy.").

### iii. *Enforceability of the Stock Option Non–Competes*

#### (a) *Protectible Interest*

 Laidlaw contends that it has a protectible interest in the confidential information and customer relationships that Byrne, Pearson, and Reddan obtained while at Laidlaw, and thus, their stock-option non-competes are enforceable.

While confidential information and customer relationships are protectible interests, *see Whitmyer Bros.,* 58 N.J. at 33, 274 A.2d 577; *Ingersoll–Rand,* 110 N.J. at 628, 542 A.2d 879, the Court finds that the principal thrust of these non-competes is not to protect these interests, but rather, to restrain competition.

Normally, a business seeking to protect its confidential information or customer relationships requires its employees to sign non-competition agreements. Thus, the employee gives the employer the non-compete in exchange for the opportunity to receive confidential information and develop customer relationships. In effect, the company says to the prospective employee: "We want to hire you. But if you come work for us, you will obtain confidential information and develop customer relationships while working here. After you leave us, we do not want you to go out and use that information and those relationships to harm us. So if you want to work for us, you have to first promise that you will not compete against us for a period after you leave us."

Here however, Laidlaw does not require the stock-option non-competes in exchange for employment, obtaining a particular position within the Company, receiving confidential information, or the opportunity to develop customer relationships. Laidlaw admits that it takes no adverse action against employees that do not sign the non-competes. Therefore, receipt of the confidential information and the opportunity to develop customer relationships is not conditioned on the signing of the stock-option non-competes. In fact, Byrne, Pearson, and Reddan already had their positions, and were already receiving or had already received the information that Laidlaw claims is propriety, and Pearson had already begun developing customer relationships. They did not have to sign the non-competes.

The Court directly questioned Laidlaw about this issue. During the testimony of James P. Folkes, who is the Vice President, Southeast Operations, with responsibility for 11 states, and who had been the DDO for New Jersey, the Court engaged the witness in the following colloquy:

> THE COURT: Here's question [sic] that bothers me. If that information is so proprietary, why is it that key employees of Laidlaw do not—are not required to sign an employment agreement with a non-compete clause in the employment agreement?

> THE WITNESS: In my case—and this is not the employment area but it's the stock area, that—

> THE COURT: Well, I'm not talking about stock. I just had Mr. Jamison here who was the district manager of New Jersey, Northwest New Jersey. My understanding is no employment agreement. He has access to all of this information. And the question comes to my mind: Well, if this information is so proprietary, why is it that a key employee like Jamison doesn't have an employment agreement which restricts him with respect to the non-compete?

> THE WITNESS: I guess the only answer I would have to offer is that you have that protection, the company has that protection in the stock options.

> THE COURT: He's not required, though, is he, to sign the stock option agreement?

> THE WITNESS: No, he's not.

(Tr. at 2:124–25.) In fact, Jamison agreed that there is probably nothing about the operations in his District that he did not know, yet he is not a participant in the stock-option non-compete. (Tr. at 2:112, 115–16.) Laidlaw never adequately explains this problem to the Court's satisfaction.

The Court concludes, therefore, that the primary purpose of the stock-option non-competes is not to protect Laidlaw's legitimate interests, but to buy out potential competition. Since the Court concludes that the covenants are principally directed at restraining competition, they are unenforceable. *See Coskey's,* 253 N.J.Super. at 636, 602 A.2d 789 ("[T]he principal thrust of an enforceable covenant may not be its anticompetitive effect."); *see also Ingersoll–Rand,* 110 N.J. at 635, 542 A.2d 879 ("[I]n cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable."); *id.* ("Courts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee. Ultimately, the consuming public would suffer from judicial nurturing of such naked restraints on competition."); *Whitmyer,* 58

N.J. at 35–36, 274 A.2d 577 ("A restraint on the employee is illegal when its purpose is the prevention of competition, except when the methods of competition to be prevented are methods commonly regarded as improper and unfair.") (citation omitted) (internal quotation marks omitted).

### 2. *Undue Hardship*

■ Even assuming that the principal aim of the stock-option non-competes was not to suppress competition, but was to protect the confidential information and to protect customer relationships, the Court would still hold that Plaintiffs have not shown a reasonable likelihood of success. Without rehashing the arguments regarding the existence of confidential information and the importance of customer relationships in the school bus business, the Court finds that the restrictive covenants are grossly unreasonable, particularly with respect to Byrne and Reddan.

Byrne only had access to a list of potential acquirees and the status of negotiations over acquisitions. There is no evidence that he ever had access to any of the figures for the components of bids, or that he was privy to any other confidential information. Thus, while Laidlaw may have had a protectible interest in its developing acquisitions and the list of prospective acquirees, it did not have a legitimate interest in the broad prohibitions imposed on Byrne. Given that Plaintiffs seek to enforce a non-compete that covers the entire United States, a reasonable restrictive covenant would have to be very narrowly drawn in other respects. *See Edelson*, 183 N.J.Super. at 441, 444 A.2d 75. The Court finds that, at most, a reasonable restrictive covenant would have prevented Byrne from working on acquisitions of companies in which Byrne knew Laidlaw had an interest, or companies that Laidlaw was in the process of acquiring, and only for a period of time that was necessary to protect that interest. Such a restrictive covenant would protect Laidlaw's interest without being unduly burdensome. The broad, three-year non-compete falls far short of being reasonable.

Reddan's non-compete is also unreasonable. Reddan did not have any operational responsibilities. Other than having had knowledge of Laidlaw's labor costs, Reddan had no knowledge whatsoever regarding bidding on school bus contracts. To the extent that he might remember what the labor costs were for particular districts in the many states in which he had responsibilities, that information is stale since he does not know Laidlaw's current labor costs. Plaintiffs also contend that Reddan had confidential information regarding Laidlaw's employees' salaries, benefits, and promotability, as well as their dreams and aspirations, (*see* Tr. at 1:17–18), and that as a result, he has an unfair advantage in recruiting Laidlaw employees. Even assuming that preventing the recruiting of one's employees is a protectible interest, a non-solicitation proscription is all to which Laidlaw would be entitled. The broad, three-year restrictive covenant in the Stock–Option Plan is completely unreasonable.

■ Pearson's non-compete is a little more reasonable. Pearson obviously had operational responsibilities and worked on many bids. He also developed customer relationships at Laidlaw (which he is now clearly exploiting for STA, *see supra* Findings of Fact ¶¶ 211–20). Thus, a reasonable covenant not to compete, ancillary to an employment agreement, would have been valid. The Court finds, however, that in light of the broad geographic scope of Pearson's non-compete, *see supra* Findings of Fact ¶ 137, the length of time and the scope of the prohibited acts are unreasonable. At most, Laidlaw would have been entitled to a one-year non-competition agreement that prevents Pearson from having any dealings with or working on any bids involving any of Laidlaw's actual or prospective customers with whom Pearson had substantial dealings on Laidlaw's behalf while in Laidlaw's employ. *Cf. Solari*, 55 N.J. at 579–86, 264 A.2d 53 (adopting a similar restrictive covenant as reasonable and noting with approval decisions holding that employers could reasonably prohibit former employees from soliciting the employer's customers whose names the employee learned through the employment relationship),

Even if the Court found that the stock-option non-competes were not primarily directed at suppressing competition, the Court would still decline to blue pencil any of these agreements. The Katten Munchin Letter put Laidlaw on notice that restrictive covenants in excess of one year were risky, particularly with respect to lower level executives. The Katten Munchin Letter also suggested that Laidlaw tailor their restrictive covenants based on the confidential information to which the covenantor had access. Without obtaining another opinion, Laidlaw deliberately chose to disregard the advice it received and adopted a much broader restrictive covenant than suggested. Failing to heed the advice contained in the opinion letter negates any inference of good faith. *Cf. International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 754 (2d Cir.1996) ("[T]he failure to follow the advice of counsel given before the infringement must factor into an assessment of an infringer's bad faith."); *Jones v. Niagara Frontier Transp. Auth. (NFTA),* 836 F.2d 731, 735 (2d Cir.1987) (finding that refusal to answer questions was willful, in part, because individual deliberately chose to ignore the advice of counsel); *Central Soya Co., Inc. v. George A. Hormel & Co.,* 723 F.2d 1573, 1577 ("Hormel's intentional disregard of its counsel's opinion negates any inference of good faith ...."); *Pentech Int'l, Inc. v. Hayduchok,* 931 F.Supp. 1167, 1178–79 (S.D.N.Y.1996) (finding willful infringement of a patent based, in part, on the fact that infringer ignored counsel's advice regarding avoidance of infringement).

The Court concludes that Laidlaw acted in bad faith by deliberately seeking to impose overbroad non-competes on its employees. Accordingly, application of the blue pencil rule would be inappropriate. "When an employer, through superior bargaining power, extracts a deliberately unreasonable and oppressive noncompetitive covenant he is no position to seek, and should not receive, equitable relief from the courts." *Solari,* 55 N.J. at 576, 264 A.2d 53.

### 3. Public Interest

Assuming that the stock-option non-competes were otherwise enforceable (i.e.,

that they were not primarily directed at suppressing competition, that Laidlaw had a protectible interest, and that the non-competes did not impose an unreasonable burden), the Court finds that the public interest would not bar the stock-option non-competes. While the public has an interest in encouraging competition in the school bus transportation industry, particularly in New Jersey, there is no evidence suggesting that the problems in New Jersey exist in the other states in which Laidlaw wants to enforce the stock-option non-competes. Even if competition in every state were as weak as in New Jersey, the public interest in greater competition would not outweigh properly limited restrictive covenants ancillary to Byrne, Pearson, and Reddan's employment. Realistically, the Court cannot say that these Defendants will have such a dramatic effect on competition, that the general interest that the public has in increasing competition would outweigh protecting Laidlaw's legitimate interests.

### B. Irreparable Harm

In this Circuit, "to show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. Economic loss does not constitute irreparable harm." *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994).

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.*

Thus, in order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction "must be of a peculiar nature, so that compensation in money cannot atone for it." *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir. 1976) (citation omitted) (internal quotation marks omitted). Moreover, "[a]n inability to precisely measure financial harm does not

make that harm irreparable or immeasurable." *Acierno,* 40 F.3d at 655.

"In addition, the claimed injury cannot merely be possible, speculative or remote." *Dice v. Clinicorp, Inc.,* 887 F.Supp. 803, 809 (W.D.Pa.1995). "Establishing a risk of irreparable harm is not enough." *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987). Rather, "[t]he requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat;' [an injunction] may not be used simply to eliminate a possibility of a remote future injury ...." *Acierno,* 40 F.3d at 655 (citations omitted).

Furthermore, in *Continental Group, Inc. v. Amoco Chemicals Corp.,* the Third Circuit held, with respect to the disclosure of confidential information, that "[r]isk of harm if information is inadvertently disclosed ... is not sufficient to satisfy the standard for granting a preliminary injunction." 614 F.2d 351, 358 (1980). "There must be an imminent threat of the allegedly harmful disclosure." *Id.* "[I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued to restrain one from doing what he is not attempting and does not intend to do." *Id.* at 359.

Plaintiffs argue that Defendants have acknowledged that irreparable harm would flow from their competition with Laidlaw and that Laidlaw is entitled to injunctive relief if they violate the terms of the non-compete. "This Court[, however] is not bound by the terms of the [agreement] in which the parties agreed that a violation of the covenants would constitute irreparable harm and that [petitioner] would be entitled to an injunction. A contractual provision simply cannot act as a substitute for a finding by this Court that it would be appropriate to invoke its equitable powers." *Dice,* 887 F.Supp. at 810 (citation omitted); *see also Smith, Bucklin & Assocs., Inc. v. Sonntag,* 83 F.3d 476, 481 (D.C.Cir.1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop.") (citation omitted); *Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.,* 830 F.2d 13, 16 (2d Cir.1987) ("[T]he contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); *Firemen's Ins. Co. of Newark, N.J. v. Keating,* 753 F.Supp. 1146, 1154 (S.D.N.Y.1990) ("The [clause in the contract declaring money damages inadequate] ... does not, by its mere presence in the [contract], satisfy the requirement that plaintiff make a showing of likely irreparable harm before the Court will grant its motion for a preliminary injunction. To the contrary, the Court must fully apply the same test for irreparable harm that it would were the [clause] not to exist.") (citation omitted).

Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm. *See SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1258–59 (3d Cir.1985) (employer's customer relationships and good will protectible through covenants not to compete); *Continental Group,* 614 F.2d at 358–59 (former employee's use of confidential information may properly be enjoined); *American Eutectic Welding Alloys Sales Co., Inc. v. Rodriguez,* 480 F.2d 223, 227–29 (1st Cir.1973) (employer would be irreparably harmed absent injunction prohibiting former employee from soliciting former customers); *Ecolab Inc. v. Paolo,* 753 F.Supp. 1100, 1110 (E.D.N.Y.1991) ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages. The use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage constitute irreparable harm.") (citations omitted); *Churchill Communications Corp. v. Demyanovich,* 668 F.Supp. 207, 211 (S.D.N.Y.1987) (same). Of course, irreparable harm is not automatically presumed from a finding that Plaintiffs have a likelihood of success on the merits; rather, the Court must still make a careful examination of the particular facts.

*Baker's Aid,* 830 F.2d at 15–16 (citing, *inter alia, Continental Group,* 614 F.2d 351; *Mixing Equipment Co. v. Philadelphia Gear, Inc.,* 436 F.2d 1308 (3d Cir.1971)).

■ With these standards in mind, the Court first turns to Gallagher. Defendants argue that there can be no irreparable harm because money damages can easily repair any resulting harm. Defendants suggest that Laidlaw will be able to establish the dollar loss for every contract that Laidlaw loses as a result of STA competition.

Were the New Jersey public school system such that public bidding occurred every year, the Court would be inclined to agree. Here, however, calculation of damages is not so straightforward. Assuming that Laidlaw has a protectible interest in the Sales Agreement non-competes, and that Gallagher's non-compete is enforceable, the Court finds that Plaintiffs will suffer irreparable harm. First, Laidlaw would be entitled to damages not only when Laidlaw lost a contract to STA, but also when it won a contract but bid lower than it otherwise would have in response to competition from STA. Of course, it might be difficult in some instances for Laidlaw to prove what it would have bid had STA not submitted a competing bid. Second, when a school chooses not to renew a Laidlaw contract that it could have renewed, it will be incredibly difficult to determine whether STA's competition caused the school not to renew or the school would have done so anyway. Third, it will be impossible to calculate whether STA's competition will cause schools not to renew at some point in the future because STA hurt Laidlaw's goodwill. Such problems with calculating damages are why the loss of goodwill generally constitutes irreparable harm. It is impossible to calculate the many subtle ways that such a loss impacts a business. Accordingly, assuming that Laidlaw has shown a likelihood of success on the merits, the Court would find that the harm that would result from Gallagher's competition is irreparable.

■ The Court similarly finds that Plaintiffs have met their showing of irreparable harm with respect to Pearson, assuming, of course, that Laidlaw has a protectible interest in the Stock–Option non-competes and

that Laidlaw successfully prevailed on its claim that the non-compete was enforceable as written or as modified by blue-penciling. Pearson, on behalf of STA is actively interfering with Laidlaw's customer relationships that he himself helped to develop for Laidlaw. In both Pennsylvania and Florida, Pearson has tried to convince school districts, with which he used to meet as a Laidlaw representative, to hire STA. Such interference clearly constitutes irreparable harm. *See American Eutectic,* 480 F.2d at 227–29 (employer would be irreparably harmed absent injunction prohibiting former employee from soliciting former customers).

■ With respect to the remaining Defendants, however, the Court finds that even assuming Plaintiffs have a likelihood of success on the merits, they have failed to establish irreparable harm. Even assuming that Byrne had confidential information regarding Laidlaw's potential acquirees and the status of Laidlaw's negotiations over acquisitions, there is no evidence that Byrne is using that information in any way. The evidence clearly shows that at STA, Byrne has been involved in only two acquisitions for school bus companies. Byrne had no knowledge of any Laidlaw interest in either of those companies.

Similarly, even if Reddan had confidential information regarding Laidlaw employee's salaries and labor costs, there is no evidence whatsoever that Reddan is soliciting former Laidlaw employees, involved in bidding on school bus contracts for STA, or is in any way utilizing this confidential information. Nor is there evidence that he is likely to do so in the immediate future.

Finally, Laidlaw has not shown that Thomas Gallagher has ever used any information that Laidlaw claims is confidential or proprietary, or that he has had any contact with any customer of Laidlaw. Before Thomas Gallagher's heart surgery, he spent a few days a week doing non-substantive work for STA. Given his current health problems, there certainly is no evidence to suggest that Thomas Gallagher is likely to use any confidential information he might possess or actively interfere with any customer in the near future. The Court does not see how any-

thing that Thomas Gallagher is currently doing could possibly cause Plaintiffs irreparable harm.

Without any evidence that Byrne, Reddan, or Thomas Gallagher are using, or, in the immediate future, are likely to use such confidential information, solicit Laidlaw employees, or interfere with proprietary customer relationships, Plaintiffs are not entitled to an injunction. *Continental Group*, 614 F.2d at 359 ("[I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued to restrain one from doing what he is not attempting and does not intend to do.").[2]

### 3. Balance of Harms

■■■■■ On a motion for a preliminary injunction, the Court should also consider, when appropriate, whether the need for an injunction outweighs the harm likely to be inflicted on others. The Court recognizes that where defendants willfully breach a valid restrictive covenant, the harm to defendants "is a predictable consequence of their willful breach" and "[a]s such, it is not the type of harm from which we seek to protect a defendant." *Jiffy Lube*, 834 F.Supp. at 693. Notwithstanding the foregoing, granting the preliminary injunction against Byrne, Pearson, and Reddan would require that they be out of the work force in their respective fields in very broad geographic areas for years. In contrast, competition from these three individuals is certainly not going to cripple Laidlaw, who is North America's largest school bus business, and whose 1997 revenues were $1.36 billion. Thus, the harm to these individuals caused by granting the injunction is far greater than harm to Laidlaw that would result from denying the injunction. The Court cannot countenance the severe harm to

Defendants Byrne, Pearson, and Reddan, particularly where Plaintiffs have made such a weak showing of a likelihood of success. *Cf. National Labor Relations Board v. Electro–Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir. 1996) ("The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor .... In other words, a strong showing ... of likely success on the merits can offset a weak showing of harm.") (citation omitted) (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608; *Lancor v. Lebanon Housing Auth.*, 760 F.2d 361, 363 (1st Cir.1985) (holding that the plaintiff's strong showing on the balance of harms compensates for a weaker showing on the plaintiff's likelihood of success on the merits); *Saxon Corp. v. United States Air Force*, Civ. A. No. 87–0193, 1987 WL 8524, at *2 (D.D.C. Mar.9, 1987) ("A particularly strong showing of a likelihood of success is required where, as here, the showing of irreparable harm is weak."); *Ragold, Inc. v. Ferrero, U.S.A., Inc.*, 506 F.Supp. 117, 123 n. 7 (N.D.Ill.1980) ([A] more reasonable interpretation of [*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir.1970) ] is that a weaker showing of likelihood of success on the merits is needed when there are strong showings by the movant as to irreparable harm and the balance of the equities.).[3]

Similarly, with respect to Thomas Gallagher, the balancing of the harms warrants denial of the injunction. Temporarily enjoining Thomas Gallagher pending final resolution of the merits would keep Thomas Gallagher out of the business in which he has spent probably his whole career. Although the Court is unsure of the precise effect the preliminary injunction would have in light of Thomas Gallagher's illness, the uncertainty does not change the balance of the respective harms. If Thomas Gallagher is no longer

---

**2.** Also weighing against a preliminary injunction with respect to Byrne, Reddan, and Thomas Gallagher, is that they worked for STA, respectively, for approximately 17, 4, and 6 months before Laidlaw moved for a preliminary injunction on May 18, 1998. Thus, to the extent that they did possess proprietary information, they undoubtedly divulged much of it. Injunctive relief at this time "would have ... all the earmarks of the proverbial 'locking the barn door after the

horse has been stolen.'" *Premix, Inc. v. Zappitelli,* 561 F.Supp. 269, 278 (N.D.Ohio 1983).

**3.** Of course, this is not to say that Plaintiffs are not required to establish all four requirements in order to obtain a preliminary injunction. *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 197 (3d Cir.1990) ("All four factors should favor preliminary relief before the injunction will issue.").

working, then while the injunction would cause him minimal harm, denying the injunction would not harm Laidlaw because Thomas Gallagher is no longer a threat to it. Thus, to the extent that an injunction does cause Thomas Gallagher harm, that harm outweighs any harm to Laidlaw that will result from this Court's refusal to enjoin him.

■ With respect to Gallagher, however, the Court finds that this factor does favor the grant of an injunction, assuming that Laidlaw ultimately does have a protectible interest in his Sales Agreement non-compete. As previously discussed, Gallagher would only be restricted from competing in the school bus business in New Jersey. Gallagher and STA could conduct their school bus business in every other state. Furthermore, within New Jersey Gallagher could engage in businesses other than the school bus business. Since Gallagher is Chairman and CEO of Global, and STA comprises only 10% of Global's business, then an injunction prohibiting Gallagher and STA from competing in the school bus business in New Jersey would not have so great an impact on him as to offset the irreparable harm that would befall Plaintiffs.

### 4. *Public Interest*

Although the public interest has already been examined in part in discussing the *Solari/Whitmyer* factors, the public interest involved here is slightly different. The question before was whether the public interest barred the enforcement of the covenant not to compete. The question now is how the public interest is impacted by issuing the preliminary injunction pending a final determination whether the non-compete is enforceable.

■ With respect to STA and Gallagher, the Court finds that the public interest would be adversely affected by putting them out of business pending final adjudication of the merits. "The practice of public bidding is universally recognized and deeply embedded in the public policy of this State." *N.E.R.I.,* 147 N.J. at 236, 686 A.2d 328. Thus, the public interest is furthered when courts "guard against favoritism, improvidence, extravagance, and corruption" and when competitive bidding is fostered. *Id.* Here, the public interest would be harmed because the presence of STA is having a direct and positive effect on competition in the New Jersey school bus transportation industry by lowering prices on school bus contracts. Even where STA did not win a bid, other companies, including Laidlaw, have had to lower their bids to beat out STA. The public interest would also be harmed because school boards have an interest in receiving bids from as many sources as possible. *Cf. Panther Sys.,* 783 F.Supp. at 70 ("Thus admittedly, even though defendants misappropriated the identity of certain public entities from plaintiffs, barring defendants from submitting proposals to bid on a public contract is inconsistent with public entities entertaining requests for proposals from any source."). Although the public also has an interest in the enforcement of contracts, in light of Plaintiffs' particularly weak showing of likelihood of success, the public interest in temporarily enforcing the Sales Agreement non-competes is outweighed by the public interest in encouraging competitive bidding.

■ With respect to Byrne, Pearson, and Reddan, however, Defendants have made no showing that allowing these individuals to work for STA and compete against Laidlaw will have a material effect on the state of competition in the school bus industry in New Jersey. Accordingly, the Court is unable to find that the public interest is advanced by denying a preliminary injunction. *See Coskey's,* 253 N.J.Super. at 635, 602 A.2d 789 ("While it is always possible that any individual working on the specifications to be incorporated in a bid for a public job could devise ways to hold down costs, such nebulous possibilities would generally be insufficient to satisfy the public interest test.").

## III. CONCLUSION

For the foregoing reasons, the Court **denies** Plaintiffs' motion for a preliminary injunction and **denies** Plaintiffs' motion for supplemental preliminary injunctive relief. An appropriate Order follows.

*ORDER*

This matter having come before the Court under Federal Rule of Civil Procedure 65 on the motion of Plaintiffs Laidlaw Transit, Inc. and Laidlaw, Inc. for a preliminary injunction against Defendants Student Transportation of America, Inc., Denis Gallagher, and Thomas Gallagher and Plaintiffs' motion for supplemental preliminary injunctive relief against Defendants Robert H. Byrne, John Reddan, and Peter Pearson; and

The Court having considered the written submissions of the parties, the testimony of the witnesses, the evidence introduced at the hearings, and the oral argument of counsel; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

It is on this 15th day of September, 1998 hereby ORDERED that Plaintiffs' motions for a preliminary injunction and for supplemental preliminary injunctive relief are DENIED.